# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **Restaurant Law Center, National Association of Home Builders of the United States, Colorado Restaurant Association, Home Builders Association of Metropolitan Denver, American Hotel & Lodging Association, National Apartment Association, and National Propane Gas Association,** | **Case No.** |
| **Plaintiffs,** | |
| **v.** | |
| **The City and County of Denver,** | |
| **Defendant.** | |

## INTRODUCTION

1.      Plaintiffs Restaurant Law Center, National Association of Home Builders of the United States, Colorado Restaurant Association, Home Builders Association of Metropolitan Denver, American Hotel & Lodging Association, National Apartment Association, and National Propane Gas Association seek declaratory and injunctive relief under federal law against enforcement of provisions of Denver Ordinance Nos. 21-1310 and No. 22-1653, as codified in the Revised Municipal Code of the City and County of Denver ("Revised Municipal Code") and implemented in the 2022 Denver Energy Code, that explicitly restrict the use of gas appliances (collectively, the "Municipal Appliance Bans"). But the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly and broadly preempts state and local laws on that subject. The Municipal Appliance Bans fall within the heartland of EPCA's express preemption provision because they too purport

1

to regulate the energy use of gas appliances—by preventing such use entirely. As such, the Municipal Appliance Bans are preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.,* 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley,* 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the Municipal Appliance Bans do exactly that, there is "no doubt" that EPCA preempts them. *See id.* Indeed, some state and local governments have since taken note of EPCA and abandoned their efforts to enact similar bans.

*See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. The Court must order the City and County of Denver ("Denver") to do the same.

5.      The Municipal Appliance Bans inflict serious and irreparable harm. Banning the use of gas appliances in new and existing buildings is at odds with the needs of Denver residents and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered water heaters and furnaces is fundamentally inconsistent with the public interest and consumer choice, exacerbates Denver's housing crisis, and aims to shift Denver's energy demand to an electric system that is facing historic and increasing electricity demand.

6.      Plaintiffs are comprised of a group of trade associations representing homebuilders, restaurants, apartment buildings, hotels, manufacturers, service personnel, and fuel suppliers that stand to lose much if the Municipal Appliance Bans are not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, apartment and hotel owners and managers, and retailing, manufacturing, and delivery related to fuel gas and fuel gas appliances and infrastructure. The Municipal Appliance Bans' chilling effect is already undermining the Plaintiffs' members' livelihoods, harming revenues, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing maintenance of existing and development of new desperately needed multifamily homes. Ultimately, the Municipal Appliance Bans will compel Plaintiffs to exit some or all of their businesses and trades and substantially increase the cost in Denver for apartment

homes, lodging, energy, and food service—all despite the Municipal Appliance Bans' express preemption under federal law.

7.     In sum, the Municipal Appliance Bans are plainly preempted by EPCA, are already inflicting substantial irreparable harm to Plaintiffs and their members, and will cause even more irreparable harm unless enjoined. Plaintiffs accordingly bring this action seeking (1) a declaration that the Municipal Appliance Bans are preempted by EPCA and (2) an injunction preventing their enforcement.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning a local government's compliance with EPCA. Additionally, under 42 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

9.     This Court has personal jurisdiction over the City and County of Denver and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in Denver, where many of Plaintiffs' members collectively reside and do business, and (ii) the Municipal Appliance Bans at issue are and/or will be enforced here.

## PARTIES

11.    The Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across

4

the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.5 million employees as of 2023, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including Denver. RLC's members will be harmed by the Municipal Appliance Restrictions by making the rates they pay for gas service higher than they would otherwise be due to limiting the County's gas customer base. It will also prevent them from using gas space and water heating appliances in new construction or when replacing existing heating equipment. One of RLC's members in Denver invested significant expenditures to install and maintain two gas water heating units in his restaurant approximately over 15 years ago. The member intends to continue using gas water heaters, which the Municipal Appliance Bans would prohibit. Being forced to switch to electric water heaters would push the restaurant's electric panel past their limit, as the restaurant's current units are often worked to their maximum capacity. Additionally, the member uses a gas stove in his restaurant. The stove requires the restaurant to be able to create 180,000 BTUs of heat instantly in order to heat gallons of broth and many pounds of sliced beef in a matter of minutes. The member's restaurant is designed to be quick service, meaning they aim to keep ticket times to less than three minutes. Switching to an electric wok would make it impossible to keep that type of service with the restaurant's most popular menu item, which would effectively force the shutdown of the member's restaurant. Maintaining an affordable supply of natural gas is critically important for the member's restaurant. If the member maintains a gas wok, the Municipal

Appliance Bans will harm the member by causing the member's gas energy bills to increase, because the bans will limit the pool of gas customers, thereby forcing existing gas customers to pay higher rates than they otherwise would if more customers were paying to support the system.

12.     Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. The NAHB's mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. NAHB members who do business in Denver are suffering or will imminently suffer harm to their revenues and business operations as a result of the Municipal Appliance Bans. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. NAHB's manufacturer members produce and sell gas appliances in the Denver area that building owners can no longer install and use pursuant to the Municipal Appliance Bans. For example, NAHB has members that sell gas tankless water heaters, boilers, and direct-vent heaters in this area. These manufacturers will face significant sales losses if Denver buildings can longer use their gas tankless products due to the Municipal Appliance Bans. Moreover, the Municipal Appliance Bans remove NAHB's builder members' choice to provide gas space and water heaters for their clients, which they enjoyed before the Municipal Appliance Bans were enacted. NAHB's members find that electric heating systems require higher initial installation costs and often lead to increased operational expenses for homeowners due to higher electricity prices. Additionally, the infrastructure for electric heating may require extensive upgrades to existing electrical systems, which can delay project timelines and increase overall costs. Moreover,

6

these members must now hire experts, including electricians, to determine the increased costs involved in constructing buildings that use electric space and water heating. Finally, NAHB's building owners that currently utilize gas space and water heating are impacted by the retrofit requirements. Those buildings were not initially designed for electric space and water heating. Thus, the Municipal Appliance Bans burden those buildings by requiring new electrical systems (i.e., increased amperage, larger electric panels) and other physical changes that will be necessary at the end of the useful life of the gas space and water heaters.

13.     Plaintiff Colorado Restaurant Association is the leading trade organization for the state's dynamic foodservice industry, which is a driving force for the Colorado economy. The Colorado Restaurant Association is a member of the Restaurant Law Center. The same member of the Restaurant Law Center whose harms are described in paragraph 11 is also a member of the Colorado Restaurant Association, and thus, the Municipal Appliance Restrictions harm the Association and this member for the same reasons described in that paragraph.

14.     Plaintiff Home Builders Association of Metropolitan Denver is a professional trade organization that represents the residential home building industry including homebuilders, developers, remodelers, suppliers, and service providers in the eight metro-area counties we serve. In 2023, Home Builders Association of Metropolitan Denver members closed 7,577 of the 8,193 new-built homes closed within this eight-county metro area. That is 92.5% of all 2023 new-built closings, totaling $5,359,109,781 in revenue. Home Builders Association of Metropolitan Denver members who do business in Denver are suffering or will imminently suffer harm to their revenues and business operations as a result of the Municipal Appliance Bans. One of our members uses gas furnaces, water heaters, and ranges in their newly constructed homes because they are more

reliable. In severe weather, when electricity fails, gas systems can continue to function. Additionally, in a building this member currently owns, they installed gas water heaters and ranges. Due to the Municipal Appliance Bans, the member will have to pay significant costs to retrofit the building with electric water heaters when the time comes to replace them. Moreover, transitioning to all-electric systems poses substantial challenges for the member's construction projects. Electric heating systems require higher initial installation costs and often lead to operational expenses for homeowners due to higher electricity prices. Additionally, the infrastructure for electric heating can require extensive upgrades to existing electrical systems, which can delay project timelines and increase overall costs. In this member's experience, the current supply chain for electric-only appliances is not as robust as for gas appliances, which can result in longer lead times and potential project delays. The member's construction schedules are finely tuned, and any disruption can have cascading effects on project delivery and cost efficiency. Furthermore, the Municipal Appliance Bans will harm the member by causing the member's gas energy bills to increase, because the bans will limit the pool of gas customers, thereby forcing existing gas customers to pay higher rates than they otherwise would if more customers were paying to support the system.

15.     The National Apartment Association ("NAA") is the leading voice and preeminent resource for the rental housing industry across the country. As a federation of 141 affiliated apartment associations, NAA encompasses over 96,000 members, representing more than 12 million apartment homes globally. NAA emphasizes integrity, accountability, collaboration, inclusivity, and innovation, and believes that rental housing is a valuable partner in every community. In addition to providing professional development, education, and credentialing, NAA and its network of affiliated apartment associations work to ensure that public policy does not

impede but promotes the businesses of apartment owners and operators to run their businesses and provide housing to more than 30 million American households.  NAA seeks the fair governmental treatment of rental housing organizations, including advocating the interests of the rental housing business community at large in legal cases of national concern. The Municipal Appliance Bans harm NAA's members by restricting energy choice and increasing the costs of building and maintaining apartment buildings. NAA members that do business in Denver are suffering or will imminently suffer harm to their revenues and business operations as a result of the Municipal Appliance Bans. In particular, the Municipal Appliance Bans will force NAA members to make costly electric retrofits for apartment buildings already developed using gas space and water heating. They also deprive NAA members of their ability to use gas space and water heating in new construction. These restrictions impose substantial costs on NAA members within Denver and will raise rental housing prices.

16.     The American Hotel & Lodging Association ("AHLA") is the national association representing all sectors and stakeholders in the U.S. lodging industry, including owners, real estate investment trusts, chains, franchisees, management companies, independent properties, suppliers, and state associations. AHLA strives to be an indispensable resource serving, supporting, and advocating on behalf of the American hospitality industry to build a vibrant and united hospitality industry that powers America's economy. AHLA members who do business in Denver are suffering or will imminently suffer harm to their revenues and business operations as a result of the Municipal Appliance Bans. Our members' full-service hotels in Denver often have large central plants for heating and cooling and for domestic hot water. Due to the expansive spaces and the large amount of hot water needs for guestrooms, laundry, and the kitchen, these systems

generally use natural gas as a fuel source for heating requirements, which the Municipal Appliance Bans prohibit going forward. One of our members uses gas space and water heaters in two of their Denver hotel locations. Electrifying central heating plant systems and kitchens can be extremely complex and would inflict significant capital and operational costs on our members. One of our members in Denver recently completed an electrification study for one of their hotels, and the cost estimate was above $1 million in capital expenditures without providing acceptable financial returns. The cost estimate also did not include electrical capacity at the property and with the utility, as well as space constraints, which could increase the cost by multiples and/or render the project not feasible. As such, the member intends to continue to replace gas space and water heating equipment with gas equipment, which the Municipal Appliance Bans prohibit. Furthermore, if our members continue to use gas service in their Denver locations, the Municipal Appliance Bans will harm them by causing their gas energy bills to increase, because the Municipal Appliance Bans will limit the pool of gas customers, thereby forcing existing gas customers like themselves to pay higher rates that they would otherwise pay.

17.     National Propane Gas Association ("NPGA") is a nonprofit corporation organized under the laws of New Jersey with its principal office in Washington, D.C. It represents the U.S. propane industry and has approximately 2,400 members across all fifty states, including members in Denver. Its members include retail marketers of propane gas who deliver the fuel to the end user, propane producers, transporters and wholesalers, and manufacturers and distributors of equipment, containers, and appliances. NPGA members who do business in Denver and are suffering or will imminently suffer harm to their revenues and business operations as a result of the Municipal Appliance Bans. In particular, NPGA members have customers whose buildings are

impacted by the Municipal Appliance Bans, and as a result, the Bans will decrease NGPA members' sales to less than they would be otherwise.

18.     The claims asserted herein are ripe for review because Plaintiffs challenge the facial validity of certain provisions of the Revised Municipal Code and 2022 Denver Energy Code, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 201 (1983).

19.     The Revised Municipal Code Section 10-20, as amended by Denver Ordinance No. 21-1310, requires that, no later than January 1, 2025, the Denver Building and Fire Code shall be amended to implement several electrification requirements prohibiting or limiting use of EPCA-covered natural gas products, including requirements to replace storage or instantaneous water heaters with electric water heaters and replace gas-fired warm area furnaces with electric heating systems.

20.     The Revised Municipal Code Section 10-20, as amended by Denver Ordinance No. 21-1310, also requires that, no later than January 1, 2027, the Denver Building and Fire Code shall be amended to implement several additional electrification requirements further prohibiting or limiting EPCA-covered natural gas products, including requirements to replace gas-fired boilers with electric space-heating or water-heating equipment.

21.     The Denver City Council amended the Denver Building and Fire Code in January 2023 to implement the requirements of Revised Municipal Code Section 10-20.  As of January 1, 2024, permit applications are required to comply with Sections C403.2.4 and C404.10, which

prohibit the use of fossil fuel warm air furnaces for space heating and the use of fossil fuel water heaters for water heating.

**The Bans' Restrictions On Federally Regulated Appliances**

22.     In 2021, Defendant passed Denver Ordinance No. 21-130, which amended Chapter 10 of the Revised Municipal Code to require the Denver Building and Fire Code to restrict the use of gas appliances in many instances in commercial and multifamily buildings. In the context of building codes, the term "commercial buildings" generally includes all buildings except for detached one- and two-family dwellings and townhouses no more than three stories in height; as such, commercial buildings include mixed-use buildings with restaurants, apartment buildings, hotels, condos, and houses. *See* 2022 Denver Commercial Building Code, 77, https://www.denvergov.org/files/assets/public/v/8/community-planning-and-development/documents/ds/building-codes/2022-denver-building-and-fire-code.pdf (incorporating 2021 International Building Code by reference); 2021 International Building Code, Section 101.2, https://codes.iccsafe.org/content/IBC2021P2/chapter-1-scope-and-administration.

23.     The amendments to the Revised Municipal Code require that electrification-related amendments be made to the Denver Building and Fire Code in three stages.

24.     The Revised Municipal Code directs that initial electrification-related amendments be made to the Denver Building and Fire Code by 2023, with additional amendments required by January 1, 2025, and January 1, 2027.

25.     Revised Municipal Code Section 10-20(d) requires that the Denver Building and Fire Code be amended by January 1, 2025, to implement several electrification requirements that

substantially limit or restrict the use of EPCA-covered gas appliances in commercial and multifamily buildings.

26.     Revised Municipal Code Section 10-20(d)(3) requires that "[w]hen a storage water heater or instantaneous water heater is proposed to be replaced, it shall be replaced with an electric water heater."

27.     Revised Municipal Code Section 10-20(d)(1) requires that "[w]hen a gas-fired warm air furnace located outside a building is proposed to be replaced with a new gas-fired warm air furnace, the new gas-fired warm air furnace may only provide supplementary heat, and the primary heating system shall be electric."

28.     Revised Municipal Code Section 10-20(e) requires that the Denver Building and Fire Code be amended by January 1, 2027, to implement several additional electrification requirements that further limit the use of EPCA-covered natural gas appliances in commercial and multifamily buildings, including a significant limitation on the replacement of gas-fired boilers.

29.     Revised Municipal Code Sections 10-20(e)(1) and (e)(2) require that a replacement boiler, for either space or water heating, meet not less than fifty percent of the building's heating needs and that at least fifty percent of the heating needs are met with electric equipment.  In other words, gas boilers must be replaced with electric equipment.

30.     On January 9, 2023, the Denver City Council passed Denver Ordinance No. 22-1653, amending Section 10-16 of the Denver Revised Municipal Code to adopt the 2022 Denver Building Code, including the 2022 Denver Energy Code.

31.     The 2022 Denver Energy Code implements the requirements of Revised Municipal Code Sec. 10-20(d).

32.     Beginning on January 1, 2024, commercial building permit applications must comply with Sections C403.2.4 and C404.10, which restrict the new use of natural gas appliances.

33.     Section C403.2.4 of the 2022 Denver Energy Code states that "[f]ossil-fuel warm air furnaces and electric resistance space heating equipment shall not be permitted for space heating."

34.     Section C404.10 of the 2022 Denver Energy Code states that "[f]ossil fuel and electric resistance water heaters shall not be permitted to provide potable hot water."

35.     Thus, both Sections C403.2.4 and C404.10 of 2022 Denver Energy Code and Sections 10-16 and 10-20 of the Revised Municipal Code significantly limit or ban the use of EPCA-covered gas appliances in commercial and multifamily buildings.

**EPCA Establishes National Appliance Energy Regulations**

36.     The Municipal Appliance Bans impermissibly regulate the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

37.     EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

38.     The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic

production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

39.    Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

40.    In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress' intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

41.    Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

42.     In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, The National Energy Act of 1978, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

43.     One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations only if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

44.     Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

45.     In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the

16

establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

46.     As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

47.     Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

48.     After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states can seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

49.     The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C.

§ 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

50.     In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

51.     Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts State Regulation of
Consumer and Industrial Appliances**

52.     EPCA expressly preempts state regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

53.     EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters" and "furnaces." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

54.     EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular unit of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial or a residential building. Some of the appliances regulated under the Municipal Appliance Bans are considered "consumer products."

55.     The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

56.     "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

57.     Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters, furnaces, and boilers) which are regularly sold to individuals.

58.     Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

59.     Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

60.     "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

61.     EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces,"

20

and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

62.     Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning the energy use or energy efficiency of heating equipment, water heaters, and furnaces which are regularly sold for residential, industrial, or commercial use.

### EPCA Preempts the Municipal Appliance Bans

63.     As a result, EPCA preempts the restrictions on gas appliances found in Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code and in Section 10 of the Revised Municipal Code because these sections concern the energy use of EPCA-covered gas space and water heating appliances which are regularly sold for residential, commercial, and industrial use, as they ban the use of entire classes of such appliances in commercial and multifamily buildings in Denver. EPCA also preempts any other provisions of the 2022 Denver Energy Code or Revised Municipal Code that restrict the energy use of EPCA-covered products.

64.     The Municipal Appliance Bans concern the quantity of natural gas consumed by appliances in the buildings they regulate because they go so far as to prohibit the installation of EPCA-covered products. As a result, these restrictions require that *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts the Municipal Appliance Bans.

65.     For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation must meet *all seven* of these requirements to avoid preemption.

66.     The EPCA provisions providing the possibility of an exemption from preemption for consumer appliances only apply to codes governing new construction. The Municipal Appliance Bans do not qualify for an exemption under 42 U.S.C. §§ 6297(c)(3), (f)(3) to the extent they apply to *replacements* of covered products. Such provisions do not meet the threshold requirement to avoid preemption—that the regulation or requirements be "*for new construction*." (Emphasis added).

67.     For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

68.     The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives in new construction, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

69.     When it comes to new construction, the Municipal Appliance does not meet EPCA's preemption exemption regarding consumer appliances because they fail to meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted.

70.     For example, the first requirement is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). The Municipal Appliance Bans do not meet this requirement, because they do not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. In fact, while the 2022 Denver Energy Code contains a "total building performance" pathway, buildings opting to follow this pathway must still comply with the natural gas appliance limitations in C403.2.4 and C404.10.  *See* Sections C407.1, C407.2, and Table C407.2.

71.     The second requirement to avoid preemption is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver. *Id.* § 6297(f)(3)(B). The Municipal Appliance Bans prohibit the use of gas appliances that meet federal energy efficiency standards.

72.     The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). The Municipal Appliance Bans do not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require. Instead, the Municipal Appliance Bans prohibit the use of EPCA-covered appliances.

73.     The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy

efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that *at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard*." *Id.* § 6297(f)(3)(E) (emphasis added). Here, the Municipal Appliance Bans do not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

74.     Similar to the consumer product standards, EPCA contains only limited exceptions to the default rule of preemption of state and local regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B).

75.     To avoid preemption, a local building code regulation for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i).

76.     The Municipal Appliance Bans do not meet this requirement, because they ban EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1. Like the EPCA preemption exemption for consumer appliances, the preemption exemption for industrial appliances only applies to codes governing new construction. To the extent that the Municipal Appliance Bans attempt to impose requirements concerning the energy use or energy efficiency of EPCA-covered appliances in existing buildings, EPCA provides no exemption from preemption, and the Municipal Appliance Bans are thus preempted.

77.     On information and belief, Denver cannot apply for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an exemption under 42 U.S.C. § 6297(d), because only states can apply for this waiver, and Denver is not a state. However,

24

even if Denver could make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

**CAUSES OF ACTION**

**COUNT ONE: FEDERAL PREEMPTION BY
THE ENERGY POLICY AND CONSERVATION ACT**

78.     Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

79.     Section 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code concern the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in new and existing commercial and multifamily buildings—including but not limited to certain restaurants, apartment buildings, condos, and homes—and are not exempt from preemption.

80.     Denver cannot apply for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption because Denver is not a state.

81.     The Municipal Appliance Bans' requirements for new construction do not meet EPCA's requirements to be exempt from preemption, including because, inter alia:

    a.  They do not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather require use of a particular type of appliance (*i.e.*, bans EPCA-covered gas appliances);

  b. They do not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency;

  c. There is no pathway allowing for at least one combination of items to include certain EPCA-covered gas appliances; and/or

  d. They ban EPCA-covered gas appliances, even when they meet the federal efficiency standards.

82. The Municipal Appliance Bans' restrictions on EPCA-covered gas appliances for existing buildings are not eligible for an exemption from preemption, as any applicable exemptions only apply to new construction.

83. The Municipal Appliance Bans are therefore preempted by the federal EPCA.

84. There is no set of circumstances under which the Municipal Appliance Bans would be valid.

85. Plaintiffs accordingly request that the Court declare that Section 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code are preempted by EPCA and enjoin the Defendant from enforcing the preempted provisions.

<strong>PRAYER FOR RELIEF</strong>

86. WHEREFORE, Plaintiffs pray for relief as follows:

87. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce Section 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code and prohibiting the Defendant from maintaining these provisions or

substantially similar provisions as part of the Revised Municipal Code and 2022 Denver Energy Code;

88.     For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that Section 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code are preempted by federal law because they concern the energy use of appliances covered by EPCA and are therefore void and unenforceable;

89.     For costs of this suit, including reasonable attorney's fees; and

90.     For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

BAKER BOTTS L.L.P.

   /s/ Megan H. Berge
Megan H. Berge (DC Bar No. 983714)
Scott Novak (DC Bar No. 1736274)
700 K St NW
Washington, DC
202-639-1308
megan.berge@bakerbotts.com
scott.novak@bakerbotts.com
*Counsel for Plaintiffs*


RESTAURANT LAW CENTER

   /s/ Angelo Amador
Angelo Amador (*pro hac vice motion forthcoming*)
2055 L St NW
Washington, DC 20036
202-331-5913
AAmador@restaurant.org
*Counsel for Restaurant Law Center*