IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, et. al.

Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, et. al.,

Defendants.

---

**DEFENDANT'S MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(1) and 12(b)(6)**

---

The City and County of Denver ("City" or "Denver"), through undersigned counsel, hereby moves to dismiss Plaintiffs' First Amended Complaint ECF 52 pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and in support states as follows:

**Certificate of Conferral**

From October 6-13, 2025, the parties conferred via electronic mail regarding a briefing schedule for this matter, this motion and the reasons therefore. This motion is opposed.

I.   INTRODUCTION

In their First Amended Complaint, ECF 52, Plaintiffs challenge three Denver laws regarding electrification requirements for certain space and water heating appliances. Plaintiffs allege that the laws are preempted by a federal statute, the Energy Policy Conservation Act of 1975 ("EPCA").

EPCA instituted a regime authorizing the federal government to establish energy

1

conservation standards for certain consumer and industrial equipment. In order to ensure that equipment manufacturers are subject to only one energy conservation standard for a given Covered Product, EPCA preempts state or local regulations that "concern" the energy consumption of products that are subject to a federal standard, i.e. Covered Products.

Denver's laws are unrelated to the regulatory regime created by EPCA. One law challenged by Plaintiffs requires that certain electrification standards be inserted into the Denver building and fire codes. Portions of the 2022 and 2025 Denver Energy Codes regulate the circumstances in which certain fossil fuel appliances may be utilized for space heating and potable water heating in certain buildings. These three sets of regulations are unrelated to the domain expressly preempted by EPCA and none of these laws ban the use of Covered Products which utilize fossil fuels as their energy source.

As explained more fully below, the Fist Amended Complaint must be dismissed because Plaintiffs fail to prove they have standing to bring this case and their preemption claim fails as a matter of law.

## II. DENVER ELECTRIFICATION REGULATIONS

Plaintiffs allege that EPCA preempts Section 10-20 of the Denver Revised Municipal Code ("DRMC"), 2022 Denver Energy Code Sections C403.2.4 and C404.10, and 2025 Denver Energy Code Sections C403.2.4 and C404.10 (collectively, "Denver Electrification Regulations").

### A. Denver Revised Municipal Code Sec. 10-20

In 2021, Denver enacted DRMC Section 10-20. Attached hereto as Exhibit A. DRMC Section 10-20 requires that amendments to be made to the Denver building and fire codes by

2

certain dates to implement electrification requirements for certain commercial and multifamily buildings. Ex. A, Sec. 10-20(c)-(e). Specifically, DRMC Section 10-20(c) requires that when gas-fired furnaces and water heaters are replaced, the owner of a building must comply with certain requirements such as submitting an electrification retrofit feasibility report. Ex. A, Sec. 10-20(c). The City was to implement these requirements no later than March 1, 2023. Ex. A, Sec. 10-20(c). None of the DRMC Section 10-20(c) standards prohibit replacement of a gas-fired furnace or water heater with another gas-fired furnace or water heater. Ex. A, Sec. 10-20(c)[1].

DRMC Sections 10-20(d) and (e) impose more strict electrification requirements to be implemented no later than January 1, 2025, and January 1, 2027, respectively. Ex. A, Sec. 10-20(d)-(e). These provisions, however, were never implemented. *See* ECF 43, pp. 5-6.

B.      **Denver Energy Codes**

On January 9. 2023, Denver enacted the 2022 Denver Building Code, which included the 2022 Denver Energy Code ("2022 DEC"). Attached hereto as Exhibit B. After January 1, 2024, 2022 DEC Section C403.2.4 prohibits the use of fossil-fuel warm air furnaces and electric resistance space heating equipment for space heating in new buildings and when replacing equipment subject to certain exceptions. Ex. B, Sec. C403.2.4. And after January 1, 2024, 2022 DEC Section C404.10 prohibits the use of fossil-fuel and electric resistance water heaters to provide potable hot water in new buildings and when replacing equipment subject to certain exceptions. Ex. B, Sec. C404.10.

---

[1] DRMC Sec. 10-20(c) was implemented in 2022 and 2025 Denver Energy Code Sections C503.3.2, C503.3.3, and C503.4.1, found in Exhibit B and D referenced below.

On June 11, 2025, Denver enacted the 2025 Denver Building Code, which included the 2025 Denver Energy Code ("2025 DEC"). Attached hereto as Exhibit D. After January 1, 2024, 2025 DEC Section C403.2.4 prohibits the use of fossil-fuel warm air furnaces and electric resistance space heating equipment for space heating in new buildings, absent certain exceptions. Ex. D, Sec. C403.2.4. Unlike the 2022 analogous Denver Energy Code Provision, 2025 DEC Section 403.2.4 does not apply to replacement of equipment in existing buildings. Ex. D, Sec. C403.2.4. And after January 1, 2024, 2025 DEC Section C404.10 prohibits the use of fossil-fuel and electric resistance water heaters to provide potable hot water in new buildings, again with certain exceptions. Ex. D, Sec. C404.10. 2025 DEC Section C404.10 does not apply to replacement of equipment in existing buildings. Ex. D, Sec. C404.10.

Although Plaintiffs repeatedly refer to these Building Code provisions as bans, they clearly are not. While both the 2022 and 2025 DEC Sections 403.2.4 begins with a sentence stating that fossil-fuel powered space heating equipment will not be permitted, this initial sentence is followed by nine exceptions. Ex. B, D Sec. C403.2.4. Similarly, both the 2022 and 2025 DEC Sections 404.10 also being with a sentence stating that in new buildings fossil fuel and electric resistance water heaters will not be permitted. This sentence is immediately followed by ten exceptions. Ex. B, D Sec. C404.10. In fact, as applied, approximately 50% of building owners were able to fit into an exception allowing for natural gas powered equipment under each section. Exhibit C, Declaration of Charles Bartel, ¶¶ 7-8.

### III.    STANDARD OF REVIEW

Standing is a necessary component of the United States Constitution's Article III case or controversy requirement. *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 (10th Cir.

2008). The requirement that a party have standing "serves to ensure that the plaintiff is a proper party to invoke judicial resolution of the dispute." *Id.* An objection to standing is a jurisdictional question properly made in a Rule 12(b)(1) motion. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88-89 (1998). In a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Holt v. United States*, 46 F. 3d 1000, 1003 (10th Cir. 1995) (citation omitted). "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Id.* (citation omitted). A court may consider evidence outside the pleadings "to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (citations omitted).

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss, a court must construe the complaint in favor of the plaintiffs and accept all material facts as true. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248 (10th Cir. 2023). A complaint will only survive a 12(b)(6) motion where it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, a court is not required to accept a plaintiff's legal conclusions as true. *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265 (1986)).

IV.   **ARGUMENT**

   A.   **Plaintiffs do not have Article III Standing**

### 1. Each Plaintiff Organization Must Provide Factual Detail Supporting an Imminent and Certain Injury

Standing is an indispensable part of a plaintiff's case and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation*." Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As such, affirmative factual allegations are required to establish standing and a plaintiff may not rely on arguments or conclusions. *FW/PBS, Inc. v. Dallas*, 492 U.S. 215, 231 (1990). Plaintiffs must allege specific facts to show jurisdiction and if they fail to make the necessary factual allegations, they have no standing. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936).

When Plaintiffs are organizations, as they are here, they must "make specific allegations establishing that at least one identified member has suffered or would suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009); *see also Lujan*, 405 U.S. at 563 (organization plaintiffs lacked standing because no specific facts that one or more members directly affected). Pursuant to Plaintiffs' theory of recovery, that means that each of the six Plaintiff organizations must establish that the Denver Energy Code bans Covered Products that run on natural gas for both existing and new buildings. When organizational plaintiffs fail to explicitly identify the individuals who have been, or imminently will be, harmed, they have no standing. *FW/PBS, Inc.*, 493 U.S. at 235.

The factual allegations required to establish Article III include that individual Plaintiff members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Furthermore, the alleged injuries must be both

particularized and concrete. *Id*., p. 340. Although a plaintiff with an alleged future injury may still have standing, the alleged future injury must be sufficiently imminent, which means "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Dreihaus*, 572 U.S. 149, 158 (2014). For these reasons, speculative or hypothetical injuries may not serve as the basis for Article III standing. *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 411 (2013) (alleged harm based on speculation and/or assumptions insufficient for Article III standing); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes."). Furthermore, the allegation that a defendant has violated a federal statute is insufficient to establish standing unless a plaintiff has pled a concrete injury. *Id*. at 426.

   2. *Plaintiffs Fail to Plead Specific Factual Detail Necessary for Article III Standing*

Neither as written or as applied do the Denver Energy Codes mandate the installation of a space heating or hot water heaters which run on a specific type of fuel source. As mentioned previously, although Sections 403.2.4 and 404.10 of both Denver Energy Codes begin with a sentence prohibiting the installation of equipment which is powered by fossil fuels, each section is followed by a number of exceptions to this requirement. See Ex. B, D. Section 403.2.4 contains four exceptions which specifically permit appliances which run on natural gas (Exceptions 1, 2, 7 and 8) and Section 404.10 contains three exceptions which permit appliances that run on natural gas as an energy source (Exceptions 7, 10 and 11). Ex. C, ¶¶ 3, 4.  In practice, approximately 50% of permit applicants were able to qualify for one of these exceptions which allowed them to install Covered Products that utilizes natural gas as the energy source. Ex. C, ¶¶

7

7, 8. Under these circumstances, Plaintiffs cannot support their assertions that the Denver Energy Codes are written as or operate as a ban.

Because the Denver Energy Codes simply do not ban Covered Products which are powered by natural gas either as drafted or as applied, Plaintiffs' assertions regarding imminent injury are insufficient seeing as they are based on the incorrect premise that the Denver Energy Codes ban gas-powered appliances. All allegations of harm asserted by Plaintiffs are contingent on the Denver Energy Codes being a ban. *See* ECF 52, ¶¶ 12-18. All alleged injury is future-facing and has not yet occurred; no Plaintiff member has alleged that they have already experienced an injury or that they were already forced by the Energy Code to install a space or water heater that runs on electricity rather than natural gas. To support Article III standing, each Plaintiff member must provide sufficient factual detail supporting that they do not fall within the 50% of permit applicants which receive building permits for appliances that operate from natural gas. It is only in this manner that Plaintiffs can plead concrete or imminent injury so as to give them Article III standing and such factual allegations are completely absent from the Amended Complaint.

      **B.** **Denver Electrification Regulations are not Preempted by EPCA**

Plaintiffs allege that the Denver Electrification Regulations are preempted by EPCA because they concern the "energy use" and "energy efficiency" of certain gas-fueled space and water heating appliances. ECF 52, ¶¶ 1, 67-69. EPCA requires that certain appliances meet federal energy conservation standards, and guarantees through preemption that manufacturers of appliances only need to meet uniform energy conservation standards. Since the Denver Electrification Regulations do not create different energy conservation standards from those

8

mandated by EPCA, the Denver Electrification Regulations do not fall within the domain of laws preempted by EPCA. Thus, Plaintiffs have failed to state a claim that the Denver Electrification Regulations are preempted by EPCA.

Because preemption is a matter of statutory interpretation, it is the Court's "primary task in interpreting statutes to determine congressional intent, using traditional tools of statutory construction." *Russell v. United States*, 551 F.3d 1174, 1178 (10th Cir. 2008) (citation omitted). The Court must "begin by examining the statute's plain language." *Id.* (citation omitted). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989). It is also well-established that when addressing scientific or technical subject, technical meanings apply. *See, e.g., Van Buren v. U.S.*, 593 U.S. 374, 388 n.7 (2021) (citing Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 73). The party asserting preemption "bear[s] the burden of showing that federal and state law conflict." *Day v. Skywest Airlines*, 45 F.4th, 1181, 1190 (10th Cir. 2022) (quotation omitted).

The Court, "do[es] not invoke any presumption against preemption" when a statute contains an express-preemption clause. *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023 (10th Cir. 2022). However, even if a federal statute includes an express preemption clause, that "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Thus, in interpreting a preemption clause, a court must "identify the domain expressly pre-empted." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).

   1. *EPCA Creates Federal Requirements for Appliance Energy Conservation Standards*

9

EPCA establishes a comprehensive federal regime regulating energy conservation standards for a variety Covered Products. Energy conservation standards are defined in EPCA as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or a "design requirement" for certain Covered Products. 42 U.S.C. § 6291(6); *see also* 42 U.S.C. § 6317(f)(1)(B) (regarding industrial equipment).

Energy use is the "quantity of energy directly consumed by [a Covered Product] at point of use, determined in accordance with test procedures under [ Section 6293 or Section 6314]." 42 U.S.C. §§ 6291(4), 6311(4). And the test procedures used must be designed to measure a Covered Product's energy consumption "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3); *see also* 42 U.S.C. § 6314(a)(2) ("during a representative average use cycle"). Thus, in looking at all the relevant provisions as a whole, "'energy use' is a fixed value, determined using administratively prescribed testing procedures, *see* 10 C.F.R. § 429.13, that represents the amount of energy a product consumes under typical conditions." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *4 (S.D.N.Y. Mar. 18, 2025); *see also California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1121 (9th Cir. 2024) ((Friedland, J., dissenting from denial of rehearing en banc) (stating that energy use "is a fixed number that measures the efficiency of an appliance as manufactured.")).

Energy efficiency is the "ratio of the useful output of services from [a Covered Product] to the energy use of such product, determined in accordance with test procedures under [ Section 6293 or Section 6314]." 42 U.S.C. §§ 6291(5), 6311(3). Stated differently, "'energy efficiency' standards prevent appliances from using too much energy relative to their useful output."

10

*California Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting from denial of rehearing en banc). And because energy efficiency is calculated based on a Covered Product's energy use, energy efficiency is also based on a fixed value. *See, e.g.* 16 C.F.R. § 305.18 (requiring certain air conditioners list the energy efficiency rating on its label).

In light of EPCA's focus on Covered Product energy efficiency, and that energy efficiency is determined with fixed values, its regulatory framework is not concerned with a consumer's actual use of a Covered Product, contrary to Plaintiffs' allegations. ECF 52, ¶¶ 67-69. Instead, the technical measures of energy efficiency and energy use are used to craft energy conservation standards that apply to manufacturers before a Covered Product is marketed, as they are performance standards or design requirements. *See* 42 U.S.C. §§ 6291(6), 6311(18). A product purchased by a consumer cannot be retroactively designed to comply with an energy conservation standard or performance standard. EPCA requires manufacturers to design products in accordance with fixed values of energy consumption, not how a consumer will use the product.

2. *EPCA Only Preempts State and Local Regulations that Establish Energy Conservation Standards*

EPCA's preemption provision provides that, "on the effective date of an energy conservation standard established...for any covered product, no State regulation concerning the energy efficiency [or] energy use...of such covered product shall be effective with respect to such product[.]"  42 U.S.C. 6297(c); *see also* 42 U.S.C. § 6316(b)(2)(A) (stating a similar provision for industrial products). EPCA's preemption provision is limited in scope to energy conservation standards, as demonstrated by its use of technical terms found in EPCA's substantive provisions and legislative history.

The domain expressly preempted by EPCA is state or local regulation that establishes energy conservation standards. Statutory construction principles require courts to abide by the explicit definition in a statute. *See Van Buren*, 593 U.S. at 387. Nothing in the express definitions of energy conservation standard, energy use, or energy efficiency imply that the domain of EPCA's preemption provision sought to protect anything other than energy conservation standards of a Covered Product that a manufacturer relied on in designing its product.

Due to conflicting state and local energy efficiency standards as a result of a 1978 amendment to EPCA, appliance manufacturers negotiated with consumer groups concerned with improving appliance energy efficiency to establish uniform national standards that would ease the burden on manufacturers while promoting appliance energy conservation. *Air Conditioning*, 410 F.3d at 499-500; S. Rep. No. 100-6, at 4. In 1987, Congress adopted the negotiated standards to provide uniformity and predictability to manufacturers by enacting the National Appliance Energy Conservation Act of 1987 ("NAECA"). *See Air Conditioning*, 410 F.3d at 500 (quoting S. Rep. No. 100-6, at 4 (1987)), *see also* Pub. L. No. 100-12. In addition to adopting the standards, Congress also amended EPCA's preemption provision to what it reads as today. Pub. L. No. 100-12, § 327(c); s*ee Air Conditioning*, 410 F.3d at 500.

As the preemption provision amended in NAECA is the same preemption provision currently found at 42 U.S.C. § 6297(c), the provision serves the same purpose today as it did then: guaranteeing manufacturers only must comply with uniform energy conservation standards for their Covered Products without a state or locality requiring a different energy conservation standard. This history did not consider any consumer right to use a Covered Product. *See*

*California Rest. Ass'n*, 89 F.4th at 1121 (Friedland, J., dissenting from denial of rehearing en banc).

Additionally, EPCA's use of the word "concerning" in its preemption provision does not expand the scope of EPCA's preemption to include any state or local regulation that prevents the use of Covered Products. Instead, "concerning" ensures that EPCA preempts both direct and indirect regulations of energy conservation standards. *See California Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc).

"Concerning" means the same thing as "relating to" or "with respect to." *See, e.g., Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716 (2018). And these terms express a broad preemptive purpose. *See Rowe v. New Hampshire Motor Trans. Assn.*, 552 U.S. 364, 383 (2008). However, "[i]f relate to were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as [r]eally, universally, relations stop nowhere." *Dubin v. U.S.*, 599 U.S. 110, 119 (2023) (cleaned up) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).

EPCA's use of "concerning" does not broaden its preemption provision scope to include the consumer rights to actually use Covered Products. A local law that directly required a Covered Product to have a lower energy use than required by EPCA or its implementing regulations would be preempted. But a local law that requires consumers to purchase or use more efficient appliances than allowed under a federal standard would also be preempted as an indirect regulation. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). If EPCA did not include the word "concerning" in the preemption provision, the second example of the local law above might not be preempted. *See, e.g., California Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J.,

13

dissenting from denial of rehearing en banc). The Denver Electrification Regulations neither directly nor indirectly regulate energy conservation standards of Covered Products.

As explained above, the text and context of EPCA are focused on a Covered Product's energy efficiency. *See, Ass'n of Contracting Plumbers of City of New York, Inc.*, No. 23-CV-11292 (RA), 2025 WL 843619, at *4 (concluding that the "current iteration [of] EPCA requires that Covered Products meet statutorily and/or administratively prescribed energy conservation standards" and that those products must undergo test procedures, certifications to the DOE, and labeling requirements containing energy conservation standards). The use of "concerning" in the preemption provisions does not sweep in any state or local regulation that may impact a consumer's ability to actually use a Covered Product. To find otherwise is to ignore the product-focused text and context of EPCA and ignore the defined terms of energy conservation standard, energy use, and energy efficiency.

3. *The Denver Electrification Regulations Do Not Regulate Appliance Energy Consumption.*

The Denver Electrification Regulations are not preempted by EPCA's Covered Product frameworks because they do not regulate the energy conservation standards of any Covered Product. The Denver Electrification Regulations do not reference energy conservation standards, nor are energy conservation standards essential to the operation of the Denver Energy Regulations. *See Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 324-25 (2010). The Denver Electrification Regulations do not directly regulate the energy consumption of a Covered Product by establishing a performance standard or design requirement setting a minimum level of energy efficiency or maximum level of energy use. The Denver Electrification Regulations also do not indirectly regulate the energy consumption of a regulated

14

product by preventing the use of a product because of its energy consumption that is otherwise compliant with a federal standard established under EPCA. Therefore, the Denver Electrification Regulations cannot be preempted by EPCA.

Although the Denver Electrification Regulations prevent the actual use of some regulated products, they do not do so because Denver has changed any energy conservation standards for a Covered Product. *See Bldg. Indus. Ass'n*, 683 F.3d at 1145. And, as stated in II.B and C above, EPCA does not provide a consumer a right to use a Covered Product in the colloquial sense. And, seeing as the Denver Energy Regulations do not infringe on the preempted domain, it is not preempted under EPCA. Because Plaintiffs' allegations regarding EPCA preemption are based on their alleged inability to actually use certain Covered Products, *see* ECF 52, ¶¶ 67-69, the First Amended Complaint must therefore be dismissed for failing to state a claim.

## V.   CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court dismiss the Amended Complaint with prejudice and grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 8th day of December, 2025.

By: *s/ Adam C. Hernandez*
Adam C. Hernandez
Michele A. Horn
Assistant City Attorneys
City and County of Denver
201 West Colfax Avenue, Dept. 1207
Denver, CO 80202-5332
(720) 913-3275
adam.hernandez2@denvergov.org
michele.horn@denvergov.org
Attorneys for Defendant the City and County of Denver

15

# CERTIFICATE OF SERVICE

   I hereby certify that on December 8, 2025, I caused a true and correct copy of the foregoing **DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) and 12(b)(6)** to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

| | |
|---|---|
| Megan H. Berge<br>Scott Novak<br>J. Mark Little<br>Baker Botts, LLP<br>700 K St NW<br>Washington, DC  20001<br>megan.berge@bakerbotts.com<br>scott.novak@bakerbotts.com<br>mark.little@bakerbotts.com<br>*Attorneys for Plaintiffs* | Angelo Amador<br>2055 L St NW<br>Washington, DC  20036<br>aamador@restaurant.org<br>*Attorney for Restaurant Law Center* |
| Michael A. Hiatt<br>Emma Hardy<br>Earthjustice<br>1125 17th Street, Suite 1010<br>Denver, CO  80202<br>mhiatt@earthjustice.org<br>ehardy@earthjustice.org<br>*Attorneys for Defendant-Intervenor Sierra Club* | |

                *s/ Shannon Egan*
                Shannon Egan, Paralegal
                City and County of Denver
                201 West Colfax Avenue,
                Dept. 1207
                Denver, Colorado  80202-5332