IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, COLORADO RESTAURANT ASSOCIATION, HOME BUILDERS ASSOCIATION OF METROPOLITAN DENVER, AMERICAN HOTEL & LODGING ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, and NATIONAL PROPANE GAS ASSOCIATION,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

    Defendant,

SIERRA CLUB,

    Defendant-Intervenor.

---

### DEFENDANT-INTERVENOR SIERRA CLUB'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

---

### SUMMARY OF ARGUMENT

Local governments have great latitude to protect their residents' health, safety, and welfare. *See, e.g.*, Colo. Rev. Stat. § 31-15-401(1)(b). Burning fossil fuels affects all three: it produces pollutants with serious respiratory and cardiovascular consequences, it creates fire and explosion risks, and it emits greenhouse gases that cause climate change. To combat these dangers, the City and County of Denver enacted building code standards designed to advance partial electrification of commercial and multi-family buildings. Denver's Standards will reduce

1

greenhouse gas emissions and improve air quality. Denver, Colo., Council Bill No. CB21-1310 (2021) (stating that electrifying buildings will "protect[] Denver from climate change" and "improv[e] building occupant health and safety").[1]

The Industry Groups maintain that Denver has no power to address these dangers. They claim that once the Department of Energy (DOE) establishes an energy conservation standard for an appliance under the Energy Policy and Conservation Act (EPCA), that federal law preempts state and local laws that restrict the operation of those appliances and products in any way and for any reason. Am. Compl. ¶¶ 67–82 (Docket No. 52).

But the Industry Groups are wrong. EPCA's text makes it clear that the statute only preempts state and local laws that prescribe or otherwise regulate energy conservation standards for products already subject to federal standards. The preemption provision's place within the larger statutory framework and EPCA's history as a response to the 1970s oil crisis confirm this. The preemption clause therefore has no bearing on Denver's Standards, which regulate the size and energy source of certain types of space and water heating equipment and set certain procedural obligations for property owners. They do not regulate the space and water heating equipment's energy performance. EPCA therefore does not preempt Denver's Standards. This result is not surprising, because if the Industry Groups were correct, EPCA's preemption clause would upend many state and local health and safety regulations that Colorado residents rely on,

---

[1] Plaintiffs (hereinafter the "Industry Groups") initially challenged the standards that Denver already added to its Energy Code and standards that it had not added. Compl. ¶¶ 18–21 (Docket No. 1). The Court dismissed the Industry Groups' challenges to the latter group of standards as prudentially unripe. Sept. 16, 2025 Order (Docket No. 43). Sierra Club refers to the remaining Energy Code Standards at issue collectively as "Denver's Standards" or "the Standards."

including protections against carbon monoxide poisoning and air pollution. The Court should dismiss the First Amended Complaint in its entirety.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a claim for relief when a complaint "fail[s] to state a claim upon which relief can be granted." Under Rule 12(b)(6), a court must dismiss a complaint if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

When determining the scope of a federal statute's express preemption clause, courts must discern the purpose of Congress. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86 (1996). This "must begin with [the statute's] text," *id.* at 484, as viewed in the context of "the statutory framework surrounding it," *id.* at 486 (internal quotation marks omitted). Here, the text of EPCA's preemption clause and its role within the statute's overall framework make it clear that ECPA only preempts local laws that regulate fixed energy conservation design standards for products that already have federal energy conservation standards. Denver's Standards do no such thing. Although the Industry Groups rely on the Ninth Circuit Court of Appeals' decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), that decision is significantly flawed and this Court should join the other district courts that have recently refused to apply that case. Moreover, even under the Industry Groups' expansive view of *Berkeley*—in which EPCA preempts local building codes that ban the use of gas appliances—Denver's Standards would still be lawful, as they are not bans at all. EPCA therefore does not preempt Denver's Standards under any interpretive theory.

**I.      EPCA preempts local laws concerning products' energy use as manufactured.**

Congress enacted EPCA in 1975 in response to the 1970s oil crisis, to reduce energy consumption and establish a comprehensive national energy policy. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005) (*ACRI*); *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985). In later amendments, Congress tasked DOE with establishing energy conservation standards for certain residential, commercial, and industrial appliances. *ACRI*, 410 F.3d at 499–500.

EPCA includes a preemption clause that restricts states and local governments from enacting their own competing energy conservation standards, once DOE establishes a federal standard for an appliance. Specifically, EPCA's preemption clause applies to state regulations "concerning the energy efficiency [or] energy use . . . of [a] covered product." 42 U.S.C. § 6297(c).[2] Its scope thus turns on the definitions of "energy use" and "energy efficiency." EPCA explicitly defines both terms. It defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). And it defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product," as determined in accordance with the same test procedures. *Id.* § 6291(5).

These definitions in turn point to EPCA's test procedures provision, which requires DOE to determine energy use and efficiency "during a representative average use cycle or period of use." *Id.* § 6293(b)(3). Additionally, the definition of energy use refers to "point of use," which

---

[2] EPCA includes a substantially identical preemption provision for "industrial equipment." 42 U.S.C. § 6316(a); *see* Am. Compl. ¶¶ 61–62.

4

is a technical term that describes a measurement taken "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025) (quoting *Energy Intensity Indicators: Terminology and Definitions*, DOE); *see also Van Buren v. United States*, 593 U.S. 375, 388 n.7 (2021) ("When a statute . . . is addressing a technical subject, a specialized meaning is to be expected." (cleaned up)).

In sum, "energy use" and "energy efficiency" are representative measures of the energy a product consumes based on its typical operating conditions. They are fixed design characteristics that apply equally to all products of the same model regardless of their actual performance. For example, "a gas stove of a particular model that sits uninstalled and unused has the same 'energy use' under EPCA as one that is installed and running." *Berkeley*, 89 F.4th at 1122 (Friedland, J., dissenting). EPCA thus preempts only those state and local laws that concern these design standards, such as laws that "prohibit[] . . . hook-ups for appliances with less than a certain efficiency." 47 Fed. Reg. 57198, 57215 (Dec. 22, 1982).

This interpretation is consistent with EPCA's statutory framework. EPCA's energy conservation program governs manufacturers' conduct from the design to the distribution of covered products. *See* 42 U.S.C. §§ 6291–6309.[3] It establishes design restrictions by prescribing energy conservation standards and test procedures that products must satisfy before manufacturers distribute those products in commerce. *See id.* §§ 6293, 6295; 10 C.F.R. § 429.12(a), (c)(2). And the statute requires manufacturers to convey information regarding their

---

[3] This reasoning applies equally to EPCA's treatment of industrial equipment. *See* 42 U.S.C. § 6316(a) (explicitly applying the relevant provisions of §§ 6293–6297 to industrial equipment).

product designs to consumers and to DOE. 42 U.S.C. §§ 6294, 6296. Manufacturers must also meet these obligations before their products enter the market. 16 C.F.R. § 305.7(a)(1). EPCA's preemption clause fits neatly into this scheme. It provides manufacturers clarity about the process of bringing a product to market by ensuring that they do not need to juggle "a patchwork of conflicting and unpredictable State regulations." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6 (quoting S. Rep. No. 100-6, at 12 (1987)).

Reading EPCA in this straightforward manner leads to a straightforward rule: once DOE establishes, for example, a maximum amount of energy that gas-fired furnaces may use to produce a particular level of heat, Denver cannot adopt a different efficiency standard. But the mere existence of a federal efficiency standard does not require Denver to allow the unrestricted use of gas-fired furnaces within its boundaries, regardless of local health and safety impacts.

**II.     The Court should reject *Berkeley's* flawed interpretation of EPCA.**

In their effort to sidestep EPCA's text and structure, the Industry Groups suggest this Court rely on *Berkeley*, which struck down a local law that prohibited installing gas piping in new buildings. Am. Compl. ¶ 4. As the Industry Groups see it, EPCA preempts any local laws that "directly prohibit[] the use of covered natural gas appliances in new buildings." *Id.* (quoting *Berkeley*, 89 F.4th at 1107); *see also id.* ¶¶ 67–68.

But since the *Berkeley* decision, multiple district courts have rejected *Berkeley* and ruled that EPCA does not preempt several state and local laws. *Mulhern Gas Co., Inc. v. Mosley*, No. 23-CV-1267, 2025 WL 2062194, at *13–15 (N.D.N.Y. July 23, 2025); *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5; *see also Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, No. CV 24-10482, 2025 WL 2427844, at *4–7 (C.D. Cal. July 22, 2025) (distinguishing

6

*Berkeley*). Moreover, when the Ninth Circuit rejected an en banc rehearing request in *Berkeley*, eleven judges "urg[ed] any future court that interprets [EPCA] not to repeat the panel opinion's mistakes." *Berkeley*, 89 F.4th at 1119 (Friedland, J., dissenting); *see also id.* at 1126 (Berzon, J., respecting denial of rehearing en banc). This Court should follow these courts' lead and heed that advice to not follow *Berkeley* for four reasons: (1) it disregards the preemption provision's plain language, (2) it renders many of EPCA's provisions unworkable, (3) it is inconsistent with EPCA's history, and (4) it would undermine long-established state and local powers.

First, *Berkeley* ignores EPCA's statutory definitions of "energy use" and "energy efficiency" in favor of colloquial interpretations that refer to the actual day-to-day use of individual products. *Id.* at 1101–03; *see also id.* at 1119–25 (Friedland, J., dissenting). Using a colloquial interpretation of a term is inappropriate in a technical statute, particularly given that EPCA defines the terms in question. *See Van Buren*, 593 U.S. at 388 n.7. And even where *Berkeley* noted those definitions, it followed only part of them. *Berkeley* ignored their references to EPCA's test procedures, which require DOE to determine these metrics for "a representative average use cycle or period of use" for each product model, rather than on a product-by-product basis. 42 U.S.C. § 6293(b)(3). This Court should not repeat that mistake. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (It is a court's "duty 'to give effect, if possible, to every clause and word of a statute.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

Second, *Berkeley's* definitions of "energy use" and "energy efficiency" would riddle EPCA with internal inconsistencies. "[I]dentical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)). But many of EPCA's other provisions

7

that refer to "energy use" and "energy efficiency" could not function if those terms referred to actual use, as *Berkeley* determined. For example, both EPCA's energy conservation standards and labeling requirements are tied to energy use and efficiency. *See, e.g.*, 42 U.S.C. § 6295; 16 C.F.R. §§ 305.17(a)(9), 305.20(f)(5), (g)(5). As discussed above, manufacturers must comply with these requirements *before* their products enter the stream of commerce. *See* 10 C.F.R. § 429.12(a); 16 C.F.R. § 305.7(a)(1); *accord Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5. Under *Berkeley*'s interpretation, these "rule[s] would be impossible to implement" because there would be no way to know what a product's energy use or efficiency would be before it was installed and operated. *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5. Likewise, EPCA's requirement "that manufacturers support information or reports with respect to the energy use of covered products to demonstrate their compliance with EPCA's standards" cannot "require manufacturers to somehow monitor consumers' use of appliances after installation." *Id.* (quoting *Berkeley*, 89 F.4th at 1122–23 (Friedland, J., dissenting)). Actual performance therefore cannot be what Congress intended.

   Third, history underscores that Congress had no intention of crafting a preemption clause as broad as *Berkeley* seemingly concludes. Congress initially passed EPCA to reduce domestic energy consumption and increase reliance on domestic energy. *Herrington*, 768 F.2d at 1364. These statutory objectives must guide the preemption analysis. *Medtronic*, 518 U.S. at 485–86. It would stretch credulity to presume that in addition to EPCA's plainly stated energy conservation objectives, Congress also intended EPCA to regulate greenhouse gases, much less preempt state and local climate laws, without saying so. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 437, 468 (2001) (Congress does not "hide elephants in mouseholes."). This would be especially

unlikely as the impacts of greenhouse gases were not well understood in the 1970s, let alone the subject of regulation. *See Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 507 (2007) (noting that the federal government did not acknowledge the link between greenhouse gas emissions and climate change until 1978).[4]

Nor did Congress imbue ECPA with a new intent to regulate greenhouse gases or otherwise control consumers' actual use of covered products in its 1987 amendments. The Senate Report on those amendments makes it clear that Congress intended the new energy conservation requirements, including the preemption provision, to "reduce the regulatory and economic burdens on the appliance manufacturing industry" by fixing the "growing patchwork" of different state standards that arose when DOE initially failed to implement stringent standards. S. Rep. No. 100-6, at 2, 4 (1987). The Senate Report did not mention climate change, air pollution, or the environment. *See id.*

Fourth, the Industry Groups' interpretation of *Berkeley* improperly alters the balance of federalism. Under the Industry Groups' reading of *Berkeley*, when DOE issues a federal energy conservation standard for a type of appliance, it guarantees that consumers can then use that appliance free from any local control, under any circumstance. *See* Am. Compl. ¶¶ 4, 67–69. If

---

[4] Moreover, the regulation of air pollutants falls within the purview of EPA, concurrently with States. *See, e.g.*, 42 U.S.C. §§ 7408, 7412 (granting EPA authority to determine criteria and hazardous air pollutants for regulation); *id.* § 7416 (retaining state authority to adopt and enforce "any requirement respecting control or abatement of air pollution"); *Massachusetts*, 549 U.S. at 532 (EPA's obligation to protect the public's health and welfare is "wholly independent" of statutory mandates to "promote energy efficiency"). It is highly unlikely that Congress would so cavalierly have altered this jurisdictional balance. *Cf. Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 153 (1991) ("[W]e presume . . . that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes.").

9

the preemption clause were to sweep this broadly, it would "significantly alter the balance between federal and state power" by superseding much of state and local governments' authority. *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 679 (2023) (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020)). Moreover, it would create a glaring regulatory void that nothing in EPCA or other federal laws could fill.

For example, both Denver and Colorado broadly ban unvented room heaters, which cause severe health impacts including carbon monoxide poisoning and asthma. 8 Colo. Code Regs. § 1302-14:2.2.18; *id.* § 1402-1:2.527(F); Denver Fuel Gas Code § 621. These kinds of regulations are central components of state and local governments' police powers. *See, e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of . . . the police power."). And federal statutes cannot provide comparable protection. *See* 42 U.S.C. § 6295(o)(4) (DOE may not set standards likely to result in the unavailability of any product features that are currently available in the U.S. market); *id.* § 7602(g) (defining "air pollutant[s]" subject to Clean Air Act regulation as those in the "ambient air," not indoors). In such instances, Congress must "enact exceedingly clear language if it wishes" to upset this balance. *Sackett*, 598 U.S. at 679 (quoting *Cowpasture River*, 590 U.S. at 622). Congress did not do so here.[5]

---

[5] Interpreting EPCA so that these regulations have been unlawful for years is also "an absurd result that the Court must avoid." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6.

**III.     EPCA does not preempt Denver's Standards.**

Denver's Standards fall outside the scope of EPCA's preemption provision no matter how the Court interprets this provision. First and foremost, none of the Standards that the Industry Groups challenge restrict the amount of energy a covered appliance may consume or seek to produce any energy conservation savings. Instead, the Standards encourage property owners to electrify space and water heating equipment by requiring the owners to produce an electrification report in some circumstances and by regulating the size and energy source of this equipment in various ways. Denver enacted these Standards to protect residents from air pollution and safety threats, and the Standards do not conflict or interfere with the federal energy conservation standards for this space and water heating equipment. Thus, EPCA does not preempt the Standards under the correct interpretation of EPCA described in Section I above. Furthermore, even if this Court were to adopt *Berkeley*'s "narrow" holding that EPCA preempts "building code regulation[s] that impose[] a total ban on natural gas," EPCA would not preempt Denver's Standards because they do not impose such a ban. 89 F.4th at 1102, 1106.

**A.     Denver's Standards for new buildings**

The Industry Groups challenge two Standards that regulate fossil fuel and electric resistance space and water heating equipment in new buildings: Sections C403.2.4 and C404.10. Am. Compl. ¶ 84. These Standards restrict property owners' appliance choice based on a criterion other than energy use or efficiency, namely the product's energy *source*. These Standards in practice direct builders and consumers to deploy "one set of products with one set of federal efficiency standards" (heat pumps) rather than "another set of products with different federal efficiency standards" (gas or electric resistance appliances). *Berkeley*, 89 F.4th at 1126

11

(Friedland, J., dissenting). While the Standards restrict the use of certain appliances in certain locations for health and welfare reasons, they do not prescribe a required energy use or efficiency that these appliances must achieve. EPCA thus does not preempt them. *See Mulhern Gas Co.*, 2025 WL 2062194, at *14 (EPCA does not preempt laws that "merely prohibit the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems."); *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6 (holding EPCA does not preempt a law that "regulates, indirectly, the type of fuel that a covered product may consume in certain settings, irrespective of that product's energy efficiency or use").

Furthermore, the exceptions to C403.2.4 and C404.10 are so far-reaching that in practice these Standards are not prohibitions on gas appliances at all, and thus EPCA does not preempt these Standards even under *Berkeley*'s holding. For example, exception three to C403.2.4 and exception nine to C404.10 both allow the use of electric resistance equipment in buildings that achieve total building performance metrics. Denver Energy Code §§ C403.2.4, C404.10. Any building type of any size can meet this exception if its owner implements low-carbon measures for other building features. In addition, exception ten to C404.10 allows buildings to install large-capacity or high-temperature water heating equipment fueled by any energy source. *Id.* § C404.10. It is likely that many large buildings, like the ones the Industry Groups own and construct, use this exempted equipment. And exception five to C403.2.4 gives all buildings a budget of 5 W/ft$^2$ of electric resistance space heating. *Id.* § C403.2.4. This may comprise a substantial amount of buildings' heating needs, especially smaller buildings.

The broad scope of these exceptions is clear in practice. As Denver explains in its Motion to Dismiss, its Commercial Building Plan Review Manager analyzed how Sections C403.2.4 and

12

C404.10 were implemented during a three-month period in 2025. Denver Mot. to Dismiss, Charles Bartel Decl. ¶¶ 2, 6. Denver found that 48% of approved permits subject to C403.2.4 utilized at least some gas appliances. *Id.* ¶ 7. In addition, 51% of approved permits subject to C404.10 used gas water heaters. *Id.* ¶ 8. This confirms what the text of Denver's Standards makes clear: Sections C403.2.4 and C404.10 do not "ban" the use of gas appliances, as the Industry Groups claim. *See* Am. Compl. *passim*. Thus, even under *Berkeley*, EPCA does not preempt Sections C403.2.4 and C404.10.[6]

### B. Denver's Standards for existing buildings

The Industry Groups also generally challenge Denver's regulations for existing buildings and Section 10-20 of Denver's Revised Municipal Code. Am. Compl. ¶¶ 67, 81, 84, 87, 93, 94. The Amended Complaint is unclear on whether the Industry Groups specifically challenge the standards in Revised Municipal Code § 10-20(c) or the three Energy Code sections that implement § 10-20(c): C503.3.2, C503.3.3, and C503.4.1. *Id.* Because the Amended Complaint makes no mention of § 10-20(c) or Sections C503.3.2, C503.3.3, and C503.4.1, the Court should not construe the Complaint to encompass these Standards. *See, e.g.*, *Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 804 (10th Cir. 2025); *Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 871 n.4 (6th Cir. 2007). But even if the Amended Complaint were to encompass Sections C503.3.2, C503.3.3, and C503.4.1, EPCA does not preempt these Sections.

---

[6] As discussed, the text of Sections C403.2.4 and C404.10 shows that EPCA does not preempt these Standards, and the Standards also include multiple exemptions that demonstrate the Standards do not ban gas appliances. Accordingly, the Court can grant this Motion to Dismiss regardless of Mr. Bartel's declaration, and thus it does not have to convert this Motion to a motion for summary judgment. *See, e.g.*, *Shifrin v. Colorado*, No. 09-cv-03040, 2010 WL 2943348, at *3 (D. Colo. July 22, 2010).

Sections C503.3.3 (which applies to space heating equipment) and C503.4.1 (which applies to water heating equipment) allow owners to comply by meeting procedural requirements that do not restrict the continued use of gas appliances. The Sections merely require that property owners (1) produce a report comparing the appliance cost, energy cost, and social cost of carbon of the gas heater with a heat pump; or (2) use equipment that does not exceed the actual heating/cooling load that the building needs; or (3) in the case of space heating equipment, appropriately test the connected gas piping. Denver Energy Code §§ C503.3.3; C503.4.1. The Standards do not control a property owner's appliance selection in any way, let alone based on the appliance's energy use or efficiency.

In addition, Section C503.3.2, which applies to indoor gas-fired warm air furnaces at existing buildings, also does not restrict property owners to only using appliances that conform to specified energy conservation standards. Property owners *may* satisfy C503.3.2 by installing gas furnaces with an energy efficiency of ninety percent or higher. *Id.* § C503.3.2. But they also may comply by using a furnace that satisfies a nitrogen dioxide emission standard. *Id.* A court bound by the *Berkeley* decision recently confirmed that even in the Ninth Circuit, EPCA does not preempt emission standards for nitrogen dioxide (or any other pollutant), in part because EPCA does not establish emissions standards. *Rinnai Am. Corp.*, 2025 WL 2427844, at *6 ("Rule[s] [that] address[] the pollution appliances emit and not their energy use . . . say[] nothing about the quantity of gas an appliance may use. Nor do[] [their] application[s] depend on an appliance's efficiency or energy use."). A standard like this, which "merely motivates an optional decision," is not preempted. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005).

*Berkeley*'s holding that EPCA preempts local bans on gas appliances does not apply to Denver's Standards for existing buildings. Contrary to the Industry Groups' assertions, and in stark contrast to the regulations in *Berkeley*, Sections C503.3.2, C503.3.3, and C503.4.1 do not directly or indirectly prohibit the use of gas appliances in buildings.[7] Instead, the Standards include express conditions that allow every building owner to continue to use gas appliances. No court has interpreted EPCA to preempt procedural, testing, and informational requirements like the ones imposed by these Standards. *See Drake v. Haier US Appliance Sols. Inc.*, No. 23-cv-00939, 2024 WL 590597, at *6 (N.D. Cal. Feb. 13, 2024). Accordingly, even if this court were to follow *Berkeley*, EPCA does not preempt Sections C503.3.2, C503.3.3, and C503.4.1.

## CONCLUSION

For the reasons discussed above, the Court should grant this Motion to Dismiss and dismiss the First Amended Complaint in its entirety under Rule 12(b)(6).

Dated December 8, 2025.

| | |
|---|---|
| /s/ Michael A. Hiatt<br>Michael A. Hiatt<br>Emma Hardy<br>Earthjustice<br>1125 17th Street, Suite 1010<br>Denver, CO 80202<br>(303) 623-9466<br>mhiatt@earthjustice.org<br>ehardy@earthjustice.org | Matthew Gerhart<br>Jim Dennison<br>Sierra Club<br>1536 Wynkoop St., Suite 200<br>Denver, CO 80202<br>(303) 454-3346<br>matt.gerhart@sierraclub.org<br>jim.dennison@sierraclub.org |

*Attorneys for Defendant-Intervenor Sierra Club*

---

[7] The Court is not required to accept the Industry Groups' allegations regarding the Standards' legal requirements, even at the motion to dismiss stage. *See Twombly*, 550 U.S. at 555–56.

# CERTIFICATE OF SERVICE

       I hereby certify that on December 8, 2025, I caused a true and correct copy of the foregoing **DEFENDANT-INTERVENOR SIERRA CLUB'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

Ronald Scott Novak, Jr.
Baker Botts LLP
700 K Street NW
Washington, DC 20001
(202) 639-7786
scott.novak@bakerbotts.com

*Attorney for Plaintiffs*

Jonathan Mark Little
Baker Botts LLP
910 Louisiana St.
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

*Attorney for Plaintiffs*

Michele Annette Horn
Adam C. Hernandez
Denver City Attorney's Office
201 West Colfax Avenue
Denver, CO  80202-5332
(720) 913-3260
michele.horn@denvergov.org

*Attorneys for Defendant City and County of Denver*

                                                    /s/ *Michael A. Hiatt*
                                                    Michael A. Hiatt
                                                    Earthjustice
                                                     1125 17th Street, Suite 1010
                                                     Denver, CO 80202
                                                     mhiatt@earthjustice.org