# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, COLORADO RESTAURANT ASSOCIATION, HOME BUILDERS ASSOCIATION OF METROPOLITAN DENVER, AMERICAN HOTEL & LODGING ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, and NATIONAL PROPANE GAS ASSOCIATION,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

    Defendant,

SIERRA CLUB,

    Defendant-Intervenor.

---

## PLAINTIFFS' RESPONSE TO CITY AND COUNTY OF DENVER'S MOTION TO DISMISS (ECF 57)

---

**I.**      **DISPUTED: Plaintiffs have pleaded an Article III injury.[1]**

Plaintiffs detailed in both their Original and Amended Complaints how Denver's collection of ordinances and regulations effectively banning the use of certain gas appliances (*i.e.*, the "Municipal Appliance Bans"[2]) was causing them harm both now and in the future. *See* Orig. Compl., ECF 1, pp. 3-11, ¶¶ 5-7, 11-17; Am. Compl., ECF 52, pp. 3-12, ¶¶ 5-7, 12-18. Yet now,

---

[1] Under Section III.F.2.a.i. of the Court's Civil Practice Standards, Denver must "clearly enumerate each element that movant contends must be alleged, but was not." While Denver appears to challenge Plaintiffs' standing generally, it argues only that Plaintiffs have not alleged an injury in fact; it does not otherwise dispute the other two elements of standing: causation and redressability. With that understanding, Plaintiffs address only their injuries in fact in this Response.

[2] The shorthand "Municipal Appliance Bans," as used herein, refer only to those regulations and ordinances the Court found ripe for challenge in its prior order, *see* ECF 43 at 6, along with the new regulations and ordinances that Plaintiffs identified in their Amended Complaint, *see* ECF 52, ¶¶ 33-37, 67-69, 87, 91.

almost a year and half since Plaintiffs commenced this suit, Denver has decided to challenge their standing, having stood idly by while Plaintiffs and Sierra Club briefed, and the Court ruled on, the ripeness of Plaintiffs' claims. *See* ECF Nos. 16, 35, 39, 41, 43. Standing "bears close affinity to questions of ripeness," *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975), so Denver's "silence on standing was telling—the proverbial dog that did not bark," *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 108 (2025). The threshold showing of standing, which is "lightened considerably" at the pleading stage, *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012), has been met here.

        **A.     Denver's challenge to Plaintiffs' standing rests on several mistaken premises.**

Before addressing head-on Denver's primary standing argument, there are a few points in its motion warranting clarification at the outset. *First*, Denver does not make a "factual attack on subject matter jurisdiction," as its recited standard of review suggests. Denver MTD, ECF 57, at 5. Instead, Denver's standing argument "questions the sufficiency of the complaint"—*i.e.*, whether Plaintiffs have pleaded enough facts to show that they do not meet the Municipal Appliance Bans' exceptions. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). Indeed, the two pages of argument that Denver devotes to the core of its standing argument focus on Plaintiffs' supposed failure to plead certain facts rather than question the veracity of the pleaded facts themselves. *See* Denver MTD, ECF 57, at 7 ("Plaintiffs Fail to Plead Specific Factual Detail Necessary for Article III Standing."); *id.* at 8 ("Plaintiffs' assertions regarding imminent injury are insufficient . . . ."). "When resolving [such] a facial attack on the allegations of subject matter jurisdiction, a court must accept the allegations in the complaint as true." *Graff v. Aberdeen Enters., II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023).[3]

---

[3] Denver's declaration attesting to a few building permit statistics does not convert its standing argument into a factual one. As discussed below, those statistics are irrelevant for purposes of

2

*Second*, Denver asserts that "each of the six Plaintiff organizations must establish" standing to survive its motion to dismiss. Denver MTD, ECF 57, at 6. That is wrong. While all Plaintiffs in this case have standing, only one of them need establish standing for this suit to proceed. *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Bradford v. Dep't of Labor*, 101 F.4th 707, 717 n.2 (10th Cir. 2024) (same).

*Third*, Denver argues that Plaintiffs lack standing because they "fail to explicitly identify the individuals who have been, or imminently will be, harmed." Denver MTD, ECF 57, at 6. Both the Supreme Court and Tenth Circuit, however, have held that no such identification requirement exists. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-50 (10th Cir. 2024) (noting "longstanding Supreme Court authority supporting standing for organizations whose injured members are not named" and holding that an organization can establish standing even when "the organization's members . . . are not identified by name"). Plaintiffs can thus proceed as they are without needing to "explicitly identify" their harmed members.

*Fourth*, and finally, Denver argues that its regulations do not amount to a "ban" because there are various exceptions to them. *E.g.*, Denver MTD, ECF 57, at 4, 8. At the outset, it is unclear what relevance the "ban" label has. A regulation that simply penalizes gas appliances would raise the same preemption problems as one that outright bans them. In any event, just because a ban has exceptions does not make it something other than a ban; it just makes it a ban with exceptions. Recognizing this plain fact, Denver elsewhere in its motion Denver describes the Municipal Appliance Bans as "prohibiting" gas appliances in certain circumstances. *Id.* at 3, 4, 7.

If Denver's point here is that its Municipal Appliances Bans contain so many exceptions that its bans can no longer be fairly characterized as such (*i.e.*, the proverbial exceptions that

---

standing and do not challenge the veracity of Plaintiffs' allegations. *See infra* at 4-6.

"swallow" the rule), then Denver misunderstands the scope of the exceptions. The exceptions for gas-powered space-heating equipment in new buildings, for example, are narrow and targeted. *See* Denver MTD, ECF 57-4, at 11 (listing exceptions for emergency power, make-up air systems, and heated plenums). While the exceptions for gas-powered water heaters in new buildings are somewhat broader, they are far from a universal get-out-of-ban-free card. *See id.* at 15 (listing exceptions for water heaters of a certain size and those that heat water above certain temperatures). Everything that does not fall within those limited categories is subject to the ban.

### B.  Plaintiffs have pleaded enough factual detail to establish standing.

With those points clarified, Plaintiffs can address Denver's main argument—that, to establish standing, Plaintiffs must plead "that they do not fall within the 50% of permit applicants which receive building permits for appliances that operate from natural gas." Denver MTD, ECF 57, at 8. To be clear, that 50% figure is based on permits provided for *individual* space and water heaters, not for the space- and water-heating needs *of entire buildings*. *See id.* ¶¶ 6-8. But even if that were otherwise, Denver's argument still would be a nonstarter because the exceptions do not affect the nature of Plaintiffs' harm.

Consider, for example, the harm alleged by Plaintiffs National Association of Home Builders of the United States ("NAHB") and National Propane Gas Association ("NPGA"). "NAHB's manufacturer members produce and sell gas appliances in the Denver area that building owners can no longer install and use pursuant to the Municipal Appliance Bans." Am. Compl., ECF 52, pp. 6-7, ¶ 13. That results in "significant sales losses if Denver buildings can longer use their gas tankless products due to the Municipal Appliance Bans." *Id.* Similarly, "[t]he sales and profits of NPGA members will be . . . harmed by the fact that Municipal Appliance Bans will prohibit certain gas appliances in new buildings because that prohibition necessarily reduces NPGA members' customer pool." *Id.* pp. 11-12, ¶ 18. That lost revenue from decreased sales and

4

a shrinking customer base undoubtedly qualifies as financial harm sufficient to confer standing. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("An injury in fact can be . . . a monetary injury"); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1573 (10th Cir. 1995) ("[T]he loss of an opportunity for an economic benefit may constitute a cognizable injury."). And, importantly, that harm occurs *even if* 50% of permit applicants qualify for an exception to the Municipal Appliance Bans. That is because NAHB's and NPGA's members would still lose sales to those in the other half of permit applicants who still want to use gas appliances but are prohibited from doing so under the Municipal Appliance Bans. Am. Compl., ECF 52, pp. 6-7, 11-12, ¶¶ 13, 18. So while the existence of exceptions may reduce the total *amount* of harm, it has no effect whatsoever on the *existence* of the harm necessary for NAHB's and NPGA's standing. *Cf. Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983) ("The gravity of harm does not change its character.").

Consider, too, the harm alleged by several other Plaintiffs—Restaurant Law Center ("RLC"), Colorado Restaurant Association ("CRA"), Home Builders Association of Metropolitan Denver ("Denver Builders"), and American Hotel & Lodging Association ("AHLA")—all of whom must pay higher gas bills when the Municipal Appliance Bans inevitably shrink the pool of gas customers to be smaller than it would be otherwise. Am. Compl., ECF 52, pp. 5-6, 8-10, ¶¶ 12, 14, 15, 17. Much like the manufacturing Plaintiffs' loss of revenue, that harm—increased gas prices—occurs *even if* 50% of building permit applicants qualify for an exception to the Municipal Appliance Bans. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286-87 (1997) (holding that consumers who paid more for gas as a result of a state's unlawful tax laws had standing). Those in the other half of permit applicants who can no longer buy gas despite a desire to do so will cause higher gas prices for those who can. Am. Compl., ECF 52, pp. 5-6, 8-10, ¶¶ 12, 14, 15, 17. So,

5

again, the existence of exceptions to the Municipal Appliance Bans makes no Article III difference to the harm of RLC, CRA, Denver Builders, or AHLA. That harm, even if it were lessened by the exceptions, occurs regardless. *See Metro. Edison Co.*, 460 U.S. at 778.

Plaintiffs' harm is illustrated well by the Supreme Court's recent decision in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025). There, producers of gasoline and liquid fuels filed suit after the EPA approved California regulations requiring automakers to "manufacture more electric vehicles and fewer gasoline-powered vehicles." *Id.* at 104. The fuel producers alleged financial harm from the regulations, "assert[ing] that the California regulations reduce the manufacture and sale of cars powered by gasoline and other liquid fuels, thereby causing a decrease in sales of those fuels by the fuel producers." *Id.* The Supreme Court held that the fuel producers' allegations sufficed to establish standing. *Id.* at 113-14. "[C]ommonsense economic principles support the fuel producers' standing," the Court explained, because the regulations "force automakers to produce a fleet of vehicles that, as a whole, uses significantly less gasoline," and that "in turn will likely 'cause downstream or upstream economic injuries in the chain,' such as producers of gasoline and other liquid fuels." *Id.* at 117. "Those monetary costs," the Court held, "are of course an injury." *Id.* at 114.

All the same can be said with respect to Plaintiffs in this case. It takes nothing more than "commonsense economic principles" to conclude that it is "likely" that the Municipal Appliance Bans will decrease the revenue of gas-appliance manufacturers and those who sell gas, such as NAHB's and NPGA's members, *see* Am. Compl., ECF 52, pp. 6-7, 10-11, ¶¶ 13, 18, and shrink the pool of gas customers, thereby forcing existing gas customers, such as Plaintiffs RLC, CRA, Denver Builders, and AHLA, to pay higher rates than they otherwise would, *id.* pp. 5-6, 8-9, 11-12, ¶¶ 12, 14, 15, 18. This is a "predictable chain of events"—really, just a commonsense

6

inference—establishing Plaintiffs' Article III injuries. *Alliance for Hippocratic Med.*, 602 U.S. at 385. Notably, too, the gas-prohibiting regulations at issue in *Diamond Alternative Energy* also included various exemptions, *e.g.*, Cal. Code Regs., tit. 13, § 1961.3 (exempting emergency and heavy-duty vehicles from emissions requirements), and yet the existence of those exemptions in no way affected the Supreme Court's standing analysis, *see generally Diamond Alternative Energy*, 606 U.S. at 115-24. They should not affect the standing analysis in this case, either.

On top of all that, Plaintiffs also will lose the reliability, cost advantages, and installation efficiencies of gas space and water heaters as a result of complying with the Municipal Appliance Bans. *See* Am. Compl., ECF 52, pp. 5-12, ¶¶ 12, 13, 14, 15, 16, 17.

All of these are concrete, Article III injuries that federal courts have recognized time and again. *See, e.g.*, *Hydro Resources, Inc. v. EPA*, 608 F.3d 1131, 1144-45 (10th Cir. 2010) ("The out-of-pocket costs to a business of obeying a new rule of government, whether or not there may be pecuniary loss associated with the new rule, suffices to establish an injury in fact." (citation modified)); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (observing that "it [is] enough [for standing] that the government's action increases the threat of future harm to the organization's members" (internal quotations and brackets omitted)); *Xcaliber Int'l Ltd. v. Edmondson*, No. 04-cv-0922, 2005 WL 8167483, at *3 (N.D. Okla. 2005) ("The suffering of economic loss due to compliance with a challenged ordinance constitutes an injury in fact sufficient for Article III standing.").

\*   \*   \*

In short, this is not a close call. With or without the exceptions, and however expansive Denver portrays them to be, Plaintiffs suffer Article III injuries all the same. Recent Supreme Court precedent, embracing the use of commonsense economic inferences, confirms as much. This Court

7

can therefore assure itself of its subject-matter jurisdiction and proceed to the merits.

## II.     DISPUTED: EPCA preempts the Municipal Appliance Bans.

As to the merits, the preemption inquiry under the Energy Policy and Conservation Act ("EPCA") is straightforward here. EPCA preempts any local regulations "concerning the energy efficiency [or] energy use" of EPCA-covered appliances, including gas-powered space and water heaters. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). By prohibiting certain gas appliances from using any gas energy at all, the Municipal Appliance Bans "concern" those products' energy use and efficiency and thereby run headlong into EPCA's preemption provision.

### A.     The parties agree that EPCA must be construed according to its plain text, that its preemptive scope is broad, and that the Municipal Appliance Bans prohibit the use of EPCA-covered appliances.

Plaintiffs and Denver disagree on the bottom-line question presented in this case—whether EPCA preempts the Municipal Appliance Bans—but there are some points of agreement worth noting.

First, Plaintiffs and Denver agree that because EPCA contains an express preemption provision, *see* 42 U.S.C. § 6297(c), 6316(b)(2)(A), the presumption against preemption does not apply, *see* Denver MTD, ECF 57, at 9. That means the Court should "focus on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).

Second, Plaintiffs and Denver agree that the word "concerning" and similar terms in EPCA "express a broad preemptive purpose." Denver MTD, ECF 57, at 13 (citing *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716 (2018), and *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 383 (2008)). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Appling*, 584 U.S. at 717. Here, Congress's use of the word "concerning" indicates an intent to preempt not only

8

regulations that look like the Department of Energy's ("DOE") energy conservation standards, but also regulations that merely "concern" covered appliances' energy use and efficiency. *See Berkeley*, 89 F.4th at 1103 ("[A] building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves.").

Third, Plaintiffs and Denver agree that "the Denver Electrification Regulations prevent the actual use some regulated products." Denver MTD, ECF 57, at 15. In other words, the Municipal Appliance Bans prohibit Plaintiffs and others from using certain gas-powered appliances that are already regulated and permitted for use under EPCA. It is that fact—the prohibition of certain EPCA-covered products—that makes this a straightforward case of EPCA preemption.

**B.     The text, history, and purpose of EPCA all confirm that it preempts the Municipal Appliance Bans.**

Beyond these three points, the agreement between Plaintiffs and Denver essentially stops. In its motion, Denver tries to artificially narrow the reach of EPCA preemption, but its efforts cannot be squared with the statute's text, history, and purpose.

Start with the text. EPCA preempts any local regulations "concerning the energy efficiency [or] energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The statute defines those terms broadly. It defines "energy" as "electricity[] or fossil fuels," such as natural gas. 42 U.S.C. §§ 6291(3), 6311(7). It then defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and as "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products and specifies certain procedures for measuring that value. *Id.* §§ 6291(4), 6311(4). So EPCA preemption is aimed at regulations concerning the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—that can be used by an EPCA-covered

9

product at its "point of use"—*i.e.*, "the place where or time when a product or service is used," Cambridge English Dictionary Online[4]; *see Berkeley*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022)).

That is exactly what the Municipal Appliances Bans do: They concern the quantity of natural gas consumed by appliances in the buildings they regulate because they go so far as to prohibit the use of EPCA-covered gas products altogether. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when DOE requires those products to use different, non-zero levels of gas energy. They also concern the "energy efficiency" of EPCA-covered gas appliances because they ban such appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas and effectively require those products to have an impossible level of energy efficiency. *See* 42 U.S.C. § 6291(5) (defining "energy efficiency" as "the ratio of useful output of services from a consumer product to the energy use of such product"). Thus, EPCA preempts the Municipal Appliance Bans.

Notably, in striking down a local prohibition on gas piping in new buildings under EPCA, the Ninth Circuit emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Berkeley*, 89 F.4th at 1107. Again, that is exactly what the Municipal Appliance Bans do. *See, e.g.*, 2025 Denver Energy Code § C.403.2.4 ("In new buildings, fossil-fuel warm air furnaces and electric resistance space heating equipment shall not be permitted for spacing heating and ventilation conditioning."); *id.* § C.404.10 ("In new buildings, fossil fuel and electric resistance water heaters shall not be permitted to provide potable hot water."). Thus, under the Ninth Circuit's reasoning, EPCA would

---

[4] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

"no doubt" preempt the Municipal Appliance Bans.[5]

The history and purpose of EPCA further confirm that the Municipal Appliance Bans fall under its preemptive scope. *Cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 490 (1996) (noting the relevance "of the basic purpose of the legislation as well as its history" to preemption). As originally enacted in 1975, EPCA took a relatively laissez faire approach to state regulation, permitting local regulatory variances so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than federal standards. Pub. L. No. 94-163, § 327(b)(2), 89 Stat. 871, 927 (1975).

Since 1975, however, Congress has amended EPCA several times, each time progressively clamping down on state and local regulatory departures and ratcheting up on federal uniformity. In 1978, for example, Congress amended parts of EPCA through the National Energy Conservation Policy Act ("NECPA"), requiring the newly created DOE to prescribe minimum energy-efficiency standards for certain products. Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). Importantly, too, NECPA also strengthened EPCA's preemption provisions, allowing state regulations that were more stringent than federal regulations, but only if the DOE found that there was a significant local interest to justify the regulation and that the regulation would not unduly burden interstate commerce. Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3264 (1978).

Despite NECPA's new requirements, "a system of separate State appliance standards ha[d] begun to emerge," creating "the problem of a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and

---

[5] Granted, as an out-of-circuit decision, *Berkeley* does not bind this Court, but it is still persuasive authority from which the Tenth Circuit would be reluctant to depart. *See Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1521 (10th Cir. 1991) ("Splitting the circuits always is something we approach with trepidation.").

11

marketing plans." S. Rep. No. 100-6, at 4 (1987). So, in 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). Through that legislation, Congress sought to "end an era of confusion and uncertainty," "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements," H.R. Rep. No. 100-11, at 24, 30 (1987), and avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class," S. Rep. No. 100-6, at 2. NAECA thus contained "two basic provisions:" "The establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2. "In general, these national standards would preempt all State standards." *Id.*

The upshot of these several amendments is that EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations. "[B]y enacting EPCA," the Ninth Circuit has explained, "Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Berkeley*, 89 F.4th at 1103. Hence EPCA's broad preemption clause preempting any "State or local regulation concerning [covered appliances'] energy efficiency [or] energy use," 42 U.S.C. §§ 6297(c); 6316(b)(2)(a), along with the stringent requirements for a waiver or exception, *id.* §§ 6297(d), (f); 6316(b)(2)(D).

The purpose and history of EPCA, in short, demonstrate that the Municipal Appliance Bans are exactly the sort of local regulations that Congress sought to prevent. If allowed to stand, appliance manufacturers will once again be subjected to a "patchwork" of regulatory regimes across the nation, S. Rep. No. 100-6, at 4, and consumers and builders will have the choice of gas appliances taken from them, rendering those "covered products" effectively "unavailabl[e]," *id.* at 2. It is clear from EPCA's history and purpose that Congress intended to avoid all of this.

12

\*   \*   \*

In sum, EPCA preempts the Municipal Appliance Bans by its plain text, which the statutory history and purpose confirm. The Municipal Appliance Bans "concern" the "energy use" of EPCA-covered appliances because they prohibit those appliances from using any gas energy at all. If Municipal Appliance Bans are allowed to stand, it invites the very balkanized appliance-energy market, patchwork of local regulatory regimes, and unavailability of covered products that Congress sought to prevent through EPCA and its subsequent amendments.

## C.   Denver's arguments to the contrary are unpersuasive.

Denver attempts a few counterarguments, but none is persuasive. First, Denver assumes that EPCA is concerned only with an appliance's energy conservation standards and that, by extension, EPCA's preemption provision applies only to local regulations of appliances at the manufacturing stage. *See* Denver MTD, ECF 57, at 11. The Ninth Circuit rebuffed this myopic view of EPCA in *Berkeley*, of course, 89 F.4th at 1101-02, and for good reason: it cannot be squared with EPCA's text or purpose. Consider, for example, the exception to EPCA preemption for building codes. *See* 42 U.S.C. § 6297(f) (exempting from EPCA preemption certain kinds of building codes that meet various criteria). An exception to preemption for building codes would be unnecessary if, as Denver says, EPCA exclusively concerned itself with the manufacturing process. As the Ninth Circuit explained, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Berkeley*, 89 F.4th at 1101. EPCA's reach beyond the manufacturing process is further confirmed by its preemption-waiver provision, which prohibits DOE from waiving preemption if the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." 42 U.S.C. § 6297(d)(3); *id.* § 6316(b)(2)(D) (industrial appliances). If EPCA preemption

13

concerned only the manufacturing process, its preemption waivers would not also touch on the "marketing, distribution, sale, or servicing" of covered products. Again, the Ninth Circuit recognized all this, explaining that "such a [waiver] provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product." *Berkeley*, 89 F.4th at 1104. Indeed, there would be "no doubt" that Denver's Municipal Appliance Bans, "if adopted by States and localities throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'" *Id.* (quoting 42 U.S.C. 6297(d)(3)). So Denver's attempts to confine EPCA preemption to the factory floor lack merit.

Denver's unduly narrow view of EPCA leads it to assert—again, contra *Berkeley*, 89 F.4th at 1102—that EPCA "is not concerned with a consumer's actual use of a Covered Product." Denver MTD, ECF 57, at 11. A cursory glance at statutory context belies that assertion. In multiple provisions, EPCA employs "energy use" to refer broadly to the amount of energy a product actually consumes. *See* 42 U.S.C. § 6292(b)(1) (permitting classification of products based on a determination that "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." (emphasis added)); § 6295(*l*)(1)(B) (permitting energy conservation standards for products if "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period"). Given that broader usage, along with EPCA's applicability to building codes—where consumers actually use appliances—Denver cannot escape the plainly broader scope of EPCA's preemption provision.[6]

---

[6] Denver's focus on whether EPCA creates a "consumer right" to use certain EPCA-covered products is a red herring. *See* Denver MTD, ECF 57, at 12, 13, 15. The relevant question in this case has never been whether consumers have a "right" to purchase gas appliances. It is instead whether localities like Denver can obstruct or interfere with that lawful commerce consistent with EPCA. The text, purpose, and history of EPCA all demonstrate that it cannot. *Cf. Berkeley*, 89

14

But even assuming Denver's narrow construction of EPCA were correct—that is, even if, despite its text, structure, and history, EPCA concerned itself with only energy conservation standards of appliances as they roll off the factory floor—EPCA would *still* preempt the Municipal Appliance Bans. Such standards specify how much energy an appliance may consume. *See* 42 U.S.C. § 6291(6) (defining "energy conservation standard" as a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use"). Yet, under the Municipal Appliance Bans, EPCA-covered gas space and water heaters cannot consume *any* energy. If, say, Denver issued regulations tomorrow that capped refrigerators' or dishwashers' energy use at so many kilowatt-hours per year, that would be a basic energy conservation standard preempted by EPCA. *See* Denver MTD, ECF 57, at 13 ("A local law that directly required a Covered Product to have a lower energy use than required by EPCA or its implementing regulations would be preempted."). The result should be no different if Denver—as it has already done—effectively set the "maximum quantity of energy use" for gas-powered space and water heaters at zero by banning their use outright.

## CONCLUSION

The Court should deny Denver's motion to dismiss. In the alternative, Plaintiffs request leave to amend their complaint to address any pleading defects that the Court finds exist.

By: */s/ J. Mark Little*
J. Mark Little
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
Baker Botts L.L.P.
700 K St NW
Washington, DC 20001
(202) 639-1319
scott.novak@bakerbotts.com

*Attorneys for Plaintiffs*

---

F.4th at 1106 (noting that it "does not follow" from its decision that "the City must affirmatively make natural gas available everywhere").

15

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 22, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

| | |
|---|---|
| Michele A. Horn<br>Assistant City Attorney<br>City and County of Denver<br>201 West Colfax Avenue, Dept. 1207<br>Denver, CO 80202-5332<br>(720) 913-3275<br>michele.horn@denvergov.org<br><br>*Attorney for Defendant the City and County of Denver* | Michael A. Hiatt<br>Robert Rigonan<br>Diana Ramirez<br>Earthjustice<br>633 17th Street, Suite 1600<br>Denver, CO 80202<br>(303) 623-9466<br>mhiatt@earthjustice.org<br>rrigonan@earthjustice.org<br>dramirez@earthjustice.org<br><br>Matthew Gerhart<br>Sierra Club<br>1536 Wynkoop St., Suite 200<br>Denver, CO 80202<br>(303) 454-3346<br>matt.gerhart@sierraclub.org<br><br>Jim Dennison<br>Sierra Club<br>1650 38th St. Suite 103W<br>Boulder, CO 80301<br>(435) 232-5784<br>jim.dennison@sierraclub.org<br><br>*Attorneys for Defendant-Intervenor Sierra Club*<br><br>  */s/ J. Mark Little*<br>  J. Mark Little<br>  Baker Botts L.L.P.<br>  910 Louisiana Street<br>  Houston, TX 77002<br>  (713) 229-1489<br>  mark.little@bakerbotts.com |