IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, COLORADO RESTAURANT ASSOCIATION, HOME BUILDERS ASSOCIATION OF METROPOLITAN DENVER, AMERICAN HOTEL & LODGING ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, and NATIONAL PROPANE GAS ASSOCIATION,

    Plaintiffs,

    v.

THE CITY AND COUNTY OF DENVER,

    Defendant,

SIERRA CLUB,

    Defendant-Intervenor.

**PLAINTIFFS' RESPONSE TO SIERRA CLUB'S
MOTION TO DISMISS (ECF 58)**

## INTRODUCTION

The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.*, is a comprehensive federal statute that governs the energy use and efficiency of a wide array of appliances, including gas space and water heaters. Congress chose to federalize regulation of the energy use and efficiency of those and other appliances because, as history has shown time and again, variegated regulatory regimes at the state and local levels have proven completely unworkable for manufacturers, their end-users, and everyone in between. That is why, since 1975, EPCA has preempted state and local energy use and efficiency regulations and why its preemptive effect has only grown stronger with each successive amendment to its text. As it now stands, aside from a few exceptions that are not relevant here, EPCA preempts any state or local regulations

"concerning the energy efficiency [or] energy use" of EPCA-covered gas appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A).

Notwithstanding EPCA and its broad preemptive scope, the City and County of Denver has followed a recent legislative trend and enacted an assortment of regulations, which Plaintiffs have collectively referred to as the "Municipal Appliance Bans," that prohibit the use of certain EPCA-covered gas appliances. This case thus boils down to a single, straightforward question: Whether the Municipal Appliance Bans "concern" the "energy use" or "energy efficiency" of those appliances. The intuitive answer—confirmed by statutory text, structure, and history—is yes. By prohibiting gas appliances from using any energy at all, the Municipal Appliance Bans "concern" those appliances' "energy use" and "energy efficiency." If allowed to stand, the Municipal Appliance Bans would replace EPCA's promise of national uniformity with the very patchwork regulatory regime it was designed to prevent. EPCA therefore preempts the Municipal Appliance Bans.

Throughout its motion, Sierra Club portrays EPCA as a statute with a vanishingly narrow preemption provision that covers only local regulations that directly regulate the manufacture of appliances. But that misplaced vision of EPCA is ultimately self-defeating. Indeed, even if Sierra Club were right that EPCA concerned only the "energy performance" of appliances, Sierra Club MTD, ECF 58, at 2, EPCA would *still* preempt the Municipal Appliance Bans. That is because energy performance can be measured only by reference to an appliance's input—that is, how much energy the appliance consumes. Yet, under the Municipal Appliance Bans, EPCA-covered gas space and water heaters cannot consume *any* energy. That is true regardless of whether "energy use" is a static value measured at the time the appliance leaves the factory, as Sierra Club posits, or the actual amount of energy an appliance uses in its real-world operation. Either way, zero is

2

zero. That reveals the Municipal Appliance Bans to be the harshest possible kind of "energy conservation standard"—one that permits no energy input whatsoever—that plainly "concerns" the "energy use" and "energy efficiency" of EPCA-covered appliances.

I.  **DISPUTED: EPCA preempts the Municipal Appliance Bans.**

Showing the interpretive lengths Sierra Club is willing to go to avoid EPCA, it asserts that the Municipal Appliance Bans "fall outside the scope of EPCA's preemption provision no matter how the Court interprets this provision." Sierra Club MTD, ECF 58, at 11. That is quite obviously not true, but Sierra Club is more specifically mistaken in suggesting that the Municipal Appliance Bans would survive "even if this Court were to adopt *Berkeley*'s 'narrow' holding." *Id.* In *Berkeley*, the Ninth Circuit held that EPCA preempted the City of Berkeley's ban on gas-piping installation, and in the course of so holding observed that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024). That is precisely what the Municipal Appliance Bans do here. With limited exceptions, they expressly prohibit the use of EPCA-covered gas space and water heaters in new buildings. *See, e.g.*, 2025 Denver Energy Code § C.403.2.4 ("In new buildings, fossil-fuel warm air furnaces and electric resistance space heating equipment shall not be permitted for spacing heating and ventilation conditioning."); *id.* § C404.10 ("In new buildings, fossil fuel and electric resistance water heaters shall not be permitted to provide potable hot water."). Thus, under *Berkeley*, the Municipal Appliance Bans fall to EPCA preemption.

Nevertheless, Sierra Club seems to believe that the mere existence of exceptions to the Municipal Appliance Bans saves them from *Berkeley*. *See* Sierra Club MTD, ECF 58, at 12 (noting "the exceptions to C403.2.4 and C404.10" and arguing that "EPCA does not preempt these Standards even under *Berkeley*'s holding"). Sierra Club emphasizes, for example, the fact that the regulation in *Berkeley* amounted to what the Ninth Circuit described as a "total ban on natural

3

gas." *Id.* at 11 (quoting *Berkeley*, 89 F.4th at 1102). This is a serious misunderstanding of *Berkeley*. The Ninth Circuit described the City of Berkeley's ban on gas-piping installation as "total" not because there were no exceptions to the ban (there were[1]), but because the City's ban essentially zeroed out the energy use of EPCA-covered gas appliances. *Berkeley*, 89 F.4th at 1102. As the Ninth Circuit explained, "a regulation on 'energy use' fairly encompasses an ordinance that *effectively eliminates* the 'use' of an energy source"[2] because "a regulation may 'assume the form of a prohibition." *Id.* (emphasis added) (quoting, in part, *Champion v. Ames*, 188 U.S. 321, 328 (1903)). So it did not matter whether the regulation merely restricted the energy use of EPCA-covered gas appliances (by, *e.g.*, limiting them to a certain amount of British thermal units "BTUs" per hour) or if it eliminated those gas appliances' energy use altogether (*i.e.*, 0 BTUs/hr). EPCA preempts it either way.

II.   ***Berkeley*** **was rightly decided, and its reasoning applies here.**

Unable to escape the import of *Berkeley*, Sierra Club is quick to point out that it prompted a dissent from the denial of rehearing en banc. *Id.* True enough, but "comments in a dissenting opinion . . . 'are just that: comments in a dissenting opinion.'" *Georgia v. Public.Resource.Org., Inc.*, 590 U.S. 255, 273 (2020) (brackets and citation omitted). The dissent obviously did not garner enough votes from the full court to reconsider the panel's decision. *Berkeley* is now the law of the

---

[1] *See Berkeley*, 89 F.4th at 1099 ("[T]he Ordinance prohibits, *with some exceptions*, "Natural Gas Infrastructure" in "Newly Constructed Buildings" in the City of Berkeley." (emphasis added) (citing Berkeley Mun. Code § 12.80.040(A))).

[2] Sierra Club further argues that EPCA does not apply because the Municipal Appliance Bans target a "product's energy *source*," Sierra Club MTD, ECF 58, at 11, as if a product's energy source could be distinguished from its input. EPCA has distinct standards for gas appliances, *see, e.g.*, 42 U.S.C. § 6295(e)(1)(A) (gas water heaters), and everyone agrees that Denver cannot specify lower, non-zero input amounts for EPCA-covered gas appliances. So it follows that Denver cannot avoid EPCA preemption by going *even further* and limiting those appliances' inputs to zero.

4

Ninth Circuit and a decision from which the Tenth Circuit would be reluctant to depart. *See Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1521 (10th Cir. 1991) ("Splitting the circuits always is something we approach with trepidation.").

Aside from repeatedly relying on a non-controlling dissenting opinion, *see United States v. Rickett*, 535 Fed. App'x 668, 677 (10th Cir. 2013) ("[I]t goes without saying that dissenting opinions cannot be the source of controlling law."), Sierra Club tries in various ways to criticize *Berkeley*'s controlling majority opinion, *see* Sierra Club MTD, ECF 58, at 7 (urging the Court "to not follow *Berkeley* for four reasons."). But none of its attempts, alone or taken together, is persuasive.

### A.  EPCA must be construed holistically, accounting for its structure and context.

Sierra Club first accuses the Ninth Circuit of ignoring EPCA's definition of "energy use" and construing that term to refer to "actual day-to-day use." Sierra Club MTD, ECF 58, at 7. Sierra Club is half-right. *Berkeley* did indeed construe "energy use" to refer to a consumer's actual use, but it did not do so at the expense of EPCA's text. Indeed, other parts of EPCA expressly contemplate that the term "energy use" includes real-world use of the appliances. *E.g.*, 42 U.S.C. 6292(b)(1)(B) (permitting classification of a covered product based on a determination that "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year" (emphasis added)); *id.* § 6295(*l*)(1)(B) (permitting the promulgation of energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period" (emphasis added)).[3]

---

[3] EPCA, to be sure, provides a definition for "average annual per-household energy use with respect to a type of product," 42 U.S.C. § 6292(b)(2)(A), as that term appears in § 6292(b)(1)(B),

5

And that real-world usage makes sense with respect to EPCA's preemption provision in particular, since it applies to building codes like Denver's, *see* 42 U.S.C. § 6297(f) (exempting certain building codes from EPCA preemption if they meet various criteria), that regulate the buildings where consumers actually use EPCA-covered appliances, *see Berkeley*, 89 F.4th at 1101-02 ("Right off the bat, we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants."). Thus, *Berkeley* embodies a more holistic interpretation of EPCA, not Sierra Club's unduly narrow interpretation that cannot be reconciled with the statute's structure and surrounding context. *See id.* at 1101 (analyzing the issue based on "EPCA's text, structure, and context"); *Hooper v. City of Tulsa*, 71 F.4th 1270, 1282 (10th Cir. 2023) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotations omitted)).

### B. Undefined statutory terms are given their ordinary meaning.

After emphasizing EPCA's statutory definitions, Sierra Club turns to a phrase that lacks one—"point of use"—and contends that it has a specialized meaning that Congress never bothered to mention. *See* Sierra Club MTD, ECF 58, at 4-5. This is a break from a basic rule of statutory construction, which is to give undefined terms their ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *United States v. Cope*, 676 F.3d 1219, 1226 (10th Cir. 2023) ("When a term is undefined in the statute, we give it its ordinary, everyday meaning."). Dictionaries—which carry significant weight when determining a term's ordinary meaning—support *Berkeley*'s understanding of the term: "[A]s a matter of ordinary meaning, 'point of use' means the 'place

---

but that definition uses the term "energy use" in a manner that accounts for real-world energy usage, and § 6295(*l*)(1)(B), of course, does not use that term at all.

where something is used.'" *Berkeley*, 89 F.4th at 1101 (quoting Oxford English Dictionary Online (2022)); *see* Cambridge English Dictionary Online (2025) ("the place where or time when a product or service is used").[4] Indeed, it is telling that Sierra Club does not a cite a single dictionary or other source of ordinary meaning in support of its hyper-technical understanding of the term.

### C. The meaning of statutory terms is context-dependent.

Sierra Club next asserts that *Berkeley*'s construction of EPCA "would riddle [it] with internal inconsistencies." Sierra Club MTD, ECF 58, at 7. Sierra Club's purported inconsistencies, however, are ones of its own making. Sierra Club improperly assumes, for example, that "energy use" as used in EPCA's labeling requirements must retain its identical meaning when used in EPCA's preemption provision. *Id.* But, again, that is not how statutory construction works. "A word may take on a variety of meanings in different contexts." *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1143 (10th Cir. 2008). As the Supreme Court has recognized, "the presumption of consistent usage readily yields to context, and a statutory term—even one defined in the statute—may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (internal quotations omitted).

That is undoubtedly the case here, where the relevant statutory context indicates that "energy use" has multiple different usages: for example, multiple provisions in EPCA address appliances' actual household energy use, *see* 42 U.S.C. § 6292(b)(1)(B); *id.* § 6295(*l*)(1)(B), and the building-code exception to EPCA preemption targets locations at which EPCA-covered products are actually used, *id.* § 6297(f), thus reinforcing the ordinary construction of "point of use." Sierra Club's sidestepping of EPCA's full statutory context shows that it has sold the term

---

[4] https://dictionary.cambridge.org/dictionary/english/point-of-use.

7

"energy use" far too short. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012) ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

### D. EPCA's history undermines Sierra Club's interpretation.

According to Sierra Club, "history underscores that Congress had no intention of crafting a preemption clause as broad as *Berkeley* seemingly concludes." Sierra Club MTD, ECF 58, at 8. The historical record says otherwise.[5] Even in its original form, with its more laissez faire approach to state regulation, EPCA was regarded as a "comprehensive national energy policy." S. Rep. No. 94-516, at 116-17 (1975). Since its enactment in 1975, EPCA has been amended several times, and each time Congress ratcheted up on federal uniformity and clamped down on local regulatory departures. *See* Am. Compl., ECF 52, pp. 17-19, ¶¶ 44-52. As Sierra Club concedes, the history broadly shows that, through EPCA, Congress sought to end the "era of uncertainty" and "patchwork" regulatory regime that had bogged down interstate commerce, "complicate[d the] design, production and marketing plans" of appliance manufacturers, and "result[ed] in the unavailability in the State of a product type or of products of a particular performance class." *Id.* p. 18, ¶¶ 48, 50 (quoting S. Rep. No. 100-6, at 2, 4 (1987), and H.R. Rep. No. 100-11, at 24 (1987)); *see* 42 U.S.C. § 6295(o)(4).

Tellingly, Sierra Club neither disputes Plaintiffs' chronicling of EPCA's history nor explains how the Municipal Appliance Bans can be reconciled with it. Indeed, it is virtually beyond

---

[5] Despite making a claim about EPCA's history, Sierra Club does not address any of EPCA's statutory or legislative history in its motion—an omission made all the more unusual in light of Plaintiffs' recounting of the history in their original and amended complaints. *See generally* Orig. Compl., ECF 1, pp. 14-19, ¶¶ 37-51; Am. Compl., ECF 58, pp. 15-20, ¶¶ 39-53. Sierra Club instead pivots directly to EPCA's purpose, which is a separate and distinct inquiry that Plaintiffs will address below. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 490 (1996) (differentiating between "the basic purpose of the legislation as well as its history" for preemption purposes).

dispute that the Municipal Appliance Bans, if allowed to stand and proliferate, would undoubtedly complicate the appliance-manufacturing market and thereby thwart EPCA's goal of national uniformity in that sphere. It would also strip consumers and builders of their ability to use gas appliances, rendering those "covered products" effectively "unavailable." EPCA's "history underscores that Congress had no intention" for any of this. Sierra Club, MTD, ECF 58, at 8; *see FDIC v. Canfield*, 967 F.2d 443, 448 n.6 (10th Cir. 1992) (finding that "[t]he legislative history is consistent with our interpretation of the statute's plain language").

Rather than grapple with the historical record and how it applies here, Sierra Club argues that Congress could not have intended to preempt "local climate laws" like the Municipal Appliance Bans because at the time EPCA was passed, "the impacts of greenhouse gases were not well understood." Sierra Club MTD, ECF 58, at 8-9. Whatever truth there is to that assertion, it is irrelevant. "It is undeniable that a state statute is not shielded from preemption merely because it expresses a different objective than the federal statute." *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 356 (D. Vt. 2007). As the Supreme Court has made clear, whether federal law preempts state or local law does not depend on "whether they are aimed at similar or different objectives," and indeed the Court noted that it had previously "struck down state statutes where the respective purposes were quite dissimilar." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

So too here. It does not matter whether, as Sierra Club asserts, the laws seek to accomplish different goals.[6] Nor does it matter whether the lawmakers who drafted EPCA and its subsequent

---

[6] If it did, it is easy to envision the pernicious consequences that would ensue. The Supreme Court foresaw them in *Perez v. Campbell*, which is why it rejected the notion that "state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than" the federal one. 402 U.S. 637, 651-52 (1971). "Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases," the Court explained,

9

amendments could have anticipated a problem like climate change, as the Supreme Court's decision in *Bostock v. Clayton County* recently illustrated. 590 U.S. 644, 674 (2020) ("[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." (internal quotations and brackets omitted)). EPCA's plain text preempts the Municipal Appliance Bans regardless.

### E.     The supremacy of federal law is an essential component to federalism.

Sierra Club also claims that Plaintiffs' "interpretation of *Berkeley* improperly alters the balance of federalism." Sierra Club MTD, ECF 58, at 9. That is both wrong and exaggerated. Plaintiffs have never asserted some sort of unqualified right or "guarantee" to use EPCA-covered gas appliances "free from any local control, under any circumstance." *Id.* Nor have they disputed the general proposition that Denver can "protect [its] residents' health, safety, and welfare." *Id.* at 1. Not only are these contrived strawmen arguments, but they do nothing more than beg the question regarding EPCA's preemptive scope. Merely because Denver promulgated the Municipal Appliance Bans based on its health-and-safety concerns does not mean that it is immune from federal preemption. "Despite the importance of the public health objective," the Supreme Court has reasoned, "we cannot agree . . . that the federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008); *cf. Blue Circle Cement, Inc. v. Bd. of Cnty. Com'rs*, 27 F.3d 1499, 1512 (10th Cir. 1994) ("[T]he mere incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." (internal quotations omitted)). In other

---

"such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Id.* at 652.

words, there is no police-power or public-health exception to federal preemption, so Sierra's Club invocation of them does little to advance the issues presented here.

Sierra Club similarly asserts (without support) that Plaintiffs' reading of EPCA "would upend many state and local health and safety regulations that Colorado residents rely on, including protections against carbon monoxide poisoning and air pollution." Sierra Club MTD, ECF 58, at 2-3. It is unclear what substantiates Sierra Club's concern here. Plaintiffs do not dispute Denver's power to regulate harmful air pollution—subject, of course, to the preemptive effect of other federal laws, such as the Clean Air Act. *See* 42 U.S.C. § 7543(a). Indeed, Denver has a whole chapter in its Municipal Code dedicated to regulating air pollution, *see* Denver Mun. Code ch. 4, none of which Plaintiffs have challenged. What matters here is the *means* by which Denver seeks to reduce greenhouse gas emissions. And this particular means—the employment of a backdoor energy conservation standard that bans EPCA-covered gas appliances—is not permissible under federal law.

Pursuing further its extravagant representation of Plaintiffs' reading of EPCA,[7] Sierra Club suggests that other health-and-safety regulations, such as Denver's regulations on unvented room heaters, are at risk of preemption. *See* Sierra Club MTD, ECF 58, at 10. Putting to one side the fact that regulations concerning unvented room heaters are not preempted under EPCA since DOE has declined to issue any such regulations itself, *see* 86 Fed. Reg. 66403, 66420 (2021); *see also* Sierra Club MTD, ECF 58, at 2 (noting the applicability of EPCA preemption "for products already

---

[7] Tellingly, Sierra Club invokes the absurdity doctrine in support of its argument, Sierra Club MTD, ECF 58, at 10 n.5, which is a narrow ground to *disregard* or *rewrite* legislative text, *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 235 (2012). Suffice it to say, reading EPCA in a way that does not comport with Sierra Club's policy objectives does not produce an absurd result. *See id.* at 237-38 (providing criteria for applying the absurdity doctrine).

11

subject to federal standards"), Plaintiffs' challenge does not call into question longstanding health-and-safety regulations that have traditionally coexisted with EPCA. EPCA preemption may be broad, but "the breadth of EPCA's preemption provision 'does not mean the sky is the limit.'" *Berkeley*, 89 F.4th at 1103 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). To be sure, delineating EPCA preemption's outer bounds may not be an easy task. But the Court need not tackle that issue here because this is not an edge case. It does not involve some nuanced, tailored regulation, but rather an outright ban on the use of EPCA-covered gas appliances in new buildings. This case, therefore, does not require the Court to delimit the boundaries of EPCA preemption. Rather, "[i]t is enough for today that wherever that line may be, this [law] is surely beyond it." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012)

## III.   Sierra Club cannot escape EPCA through creative interpretation.

Unsurprisingly, Sierra Club and Denver echo each other's view on the narrowness of EPCA, both fighting the statute's text, structure, and history to confine its preemptive scope to factory-floor energy conservation standards. *Compare* Denver MTD, ECF 57, at 11-15, *with* Sierra Club MTD, ECF 58, at 4-6. Ironically, however, even if this narrow interpretation had any merit, the Municipal Appliance Bans would *still* be preempted.

### A.   Even under Sierra Club's unduly narrow interpretation of EPCA, the Municipal Appliance Bans would still be preempted.

Sierra Club repeatedly emphasizes that EPCA preempts only local energy conservation standard, as if that were enough for the Municipal Appliance Bans to avoid EPCA's preemption clause. Recall how EPCA defines "energy conservation standard":

> The term "energy conservation standard" means— (A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title . . . .

12

42 U.S.C. § 6291(6). State and local regulations that effectively cover that same ground using different means—such as by setting a "maximum quantity of energy use" for a covered appliance through a building code—are preempted, just as more direct state and local energy conservation standards that did the same would be. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly."). So if, for example, Denver promulgated a regulation tomorrow that capped the energy use of a gas-fired furnace at so many BTUs per hour, everyone agrees that EPCA would preempt that regulation. *See* Sierra Club MTD, ECF 58, at 6 (agreeing with this example as a "straightforward rule" based on a "[r]eading of EPCA in this straightforward manner"). That would be a classic energy conservation standard, and it would plainly be preempted as a regulation "concerning" an appliance's "energy use." 42 U.S.C. § 6297(c).

But that is exactly what the Municipal Appliance Bans do. While they may not speak in the language of kilowatt-hours ("kWh"), BTUs, or any other technical "energy use" measurement, the Municipal Appliance Bans nevertheless set a "maximum quantity of energy use" standard for gas space and water heaters. By prohibiting gas use entirely, the Municipal Appliance Bans set that value at zero. *See* 2025 Denver Energy Code § C.403.2.4 ("In new buildings, fossil-fuel warm air furnaces and electric resistance space heating equipment shall not be permitted for spacing heating and ventilation conditioning."); *id.* § C404.10 ("In new buildings, fossil fuel and electric resistance water heaters shall not be permitted to provide potable hot water."). And that is true whether those appliances' "energy use" is determined on the factory floor based on "fixed design characteristics," Sierra Club MTD, ECF 58, at 5, or where consumers actually use those appliances in the real world, *Berkeley*, 89 F.4th at 1101-02. Either way, gas appliances cannot use any gas energy whatsoever under the Municipal Appliance Bans: zero therms, zero BTUs, zero anything.

13

Framed in terms of the parties' differing views of the preemption provision, that means both prohibiting all gas appliances that have a figure greater than zero specified on their kBTUs/year energy use labels, Sierra Club MTD, ECF 58, at 8 (emphasizing EPCA's labeling requirements), and barring the actual use of any gas appliance in practice. So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the Municipal Appliance Bans dial back the maximum quantity of energy it may use to nil.[8]

### B. Sierra Club's interpretation of EPCA collapses on itself.

In addition to proposing a self-defeating interpretation of EPCA, Sierra Club goes so far as to illustrate how Denver can use its gas-appliance bans in an indirect way to achieve the same preempted end. According to Sierra Club, the Municipal Appliance Bans "in practice direct builders and consumers to deploy 'one set of products with one set of federal efficiency standards' (heat pumps) rather than 'another set of products with different federal efficiency standards' (gas or electric resistance appliances)." Sierra Club MTD, ECF 58, at 11 (quoting *Berkeley*, 89 F.4th at 1126 (Friedland, J, dissenting)). Perhaps, but that only underscores why EPCA must preempt the Municipal Appliance Bans. Otherwise, it is unclear what would stop Denver from promulgating regulations favoring certain EPCA-covered products with higher energy-efficiency standards over other EPCA-covered products with lower energy-efficiency standards. After all, such regulations would not directly impose a certain efficiency standard on appliance manufacturers, but "in practice" they would indirectly raise efficiency standards by prohibiting building owners from buying and using products below a certain efficiency standard.

---

[8] Similarly, the Municipal Appliance Bans also concern the "energy efficiency" of EPCA-covered gas appliances because they ban such appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas and effectively require those products to have an impossible level of energy efficiency. *See* 42 U.S.C. § 6291(5) (defining "energy efficiency" as "the ratio of useful output of services from a consumer product to the energy use of such product").

14

Tellingly, Denver appears to break from Sierra Club on this point, assuring the Court that it could not "indirectly regulate the energy consumption of a regulated product by preventing the use of a product because of its energy consumption that is otherwise compliant with a federal standard established under EPCA." Denver MTD, ECF 57, at 14-15. Yet that is exactly what the logic of Sierra Club's argument demands, effectively permitting Denver and other localities to promulgate backdoor energy conservation standards that plainly thwart EPCA. Congress drafted a broad preemption clause in EPCA precisely to prevent that kind of mischief.[9]

## Conclusion

EPCA preempts the Municipal Appliance Bans. The text, history, and structure all lead to that answer. Sierra Club's own interpretation of EPCA does, too. The Court should accordingly deny Sierra Club's motion to dismiss. In the alternative, Plaintiffs request leave to amend their complaint to address any pleading defects that the Court finds exist.

By: */s/ J. Mark Little*
J. Mark Little
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
Baker Botts L.L.P.
700 K St NW
Washington, DC 20001
(202) 639-1319
scott.novak@bakerbotts.com

*Attorneys for Plaintiffs*

---

[9] Plaintiffs and Sierra Club agree that the Court can rule on the motion to dismiss "regardless of Mr. Bartel's declaration, and thus it does not have to convert this Motion to a motion for summary judgment." Sierra Club MTD, ECF 58, at 13 n.6. Indeed, Denver submitted the Bartel declaration in support of its subject-matter jurisdiction argument under Rule 12(b)(1), *see* Denver MTD, ECF 57, at 8, and "[a]s a general rule, a 12(b)(1) motion cannot be converted into a motion for summary judgment under Rule 56," *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987).

**CERTIFICATE OF SERVICE**

  I hereby certify that on January 22, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

| | |
|---|---|
| Michele A. Horn<br>Assistant City Attorney<br>City and County of Denver<br>201 West Colfax Avenue, Dept. 1207<br>Denver, CO 80202-5332<br>(720) 913-3275<br>michele.horn@denvergov.org<br><br>*Attorney for Defendant the City and County of Denver* | Michael A. Hiatt<br>Robert Rigonan<br>Diana Ramirez<br>Earthjustice<br>633 17th Street, Suite 1600<br>Denver, CO 80202<br>(303) 623-9466<br>mhiatt@earthjustice.org<br>rrigonan@earthjustice.org<br>dramirez@earthjustice.org<br><br>Matthew Gerhart<br>Sierra Club<br>1536 Wynkoop St., Suite 200<br>Denver, CO 80202<br>(303) 454-3346<br>matt.gerhart@sierraclub.org<br><br>Jim Dennison<br>Sierra Club<br>1650 38th St. Suite 103W<br>Boulder, CO 80301<br>(435) 232-5784<br>jim.dennison@sierraclub.org<br><br>*Attorneys for Defendant-Intervenor Sierra Club*<br><br> */s/ J. Mark Little*<br> J. Mark Little<br> Baker Botts L.L.P.<br> 910 Louisiana Street<br> Houston, TX 77002<br> (713) 229-1489<br> mark.little@bakerbotts.com |

16