IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, *et al*,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

    Defendant,

SIERRA CLUB,

    Defendant-Intervenor.

---

***AMICUS CURIAE* AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE'S BRIEF IN SUPPORT OF DENIAL OF MOTIONS TO DISMISS REGARDING FEDERAL PREEMPTION (ECF NO. 57, 58)**

---

The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") respectfully submits this *amicus curiae* brief in support of federal preemption, and in support of denial of motions to dismiss filed by the Denver Defendants (ECF No. 57), and Intervenor-Defendant Sierra Club (ECF No. 58).

**INTEREST OF *AMICUS CURIAE***

AHRI represents more than 330 manufacturers of heating, ventilation, air conditioning, and refrigeration ("HVACR"), and water heating equipment. It is an internationally recognized advocate for the HVACR and water heating industry and certifies the performance of many of the products manufactured by its members. In North America, the annual economic activity resulting from the HVACR and water

1

heating industry is more than $211 billion.  In the United States alone, AHRI member companies, along with distributors, contractors, and technicians employ more than 700,000 people.  AHRI's members manufacture products and equipment regulated by the federal Energy Policy and Conservation Act and Denver's Energy Code.  Because Denver's Energy Code affects the manufacturing, marketing, distribution, sale, and servicing of products and equipment that AHRI's members manufacture, this matter is important to AHRI and its resolution will impact its members.

## **INTRODUCTION**

The Energy Policy and Conservation Act ("EPCA") preempts state and local regulations "concerning" the "energy efficiency" or "energy use" of "covered products." 42 U.S.C. § 6297(c).  As demonstrated in Plaintiffs' Responses (ECF Nos. 59, 60), the plain text of the provisions of Denver's Energy Code challenged by Plaintiffs—as well as EPCA's preemption provision—make clear that those regulations "concern[]" the "energy efficiency" or "energy use" of covered products and, consequently, are preempted by EPCA.

This *amicus curiae* brief discusses the legislative history of EPCA's preemption provision and the legislative process that led to adoption of Denver's revised Energy Code.  EPCA's legislative history demonstrates that Congress intended to preempt state and local regulations that—like Denver's Energy Code—impact the manufacturing, marketing, distribution, sale, or servicing of covered products.  *See* 42 U.S.C. § 6297(d)(3) (prohibiting DOE from waiving federal preemption of any state regulation that "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the

2

covered product on a national basis"). The provisions of Denver's Energy Code that Plaintiffs challenge (the "Municipal Appliance Bans") are an example of recent local regulations around the country that intrude on exclusive federal authority to regulate "energy use" and "energy efficiency" of commercial and industrial HVACR and water heating equipment, in violation of EPCA. *See, e.g., California Rest. Assn v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024) (holding that EPCA preempted Berkeley prohibition of natural gas equipment in new buildings).

AHRI lauds Denver's goal of reducing greenhouse gas emissions through the promulgation of Denver's Energy Code. Nevertheless, Denver may not achieve this by contravening Congressional intent or disrupting the nationally consistent product and equipment standards that EPCA is designed to maintain. The Municipal Appliance Bans risk turning back the clock to the 1970s-era patchwork of state and local regulation of appliance energy use that led Congress to preempt state and local regulations in the first place, thereby complicating AHRI members' production and distribution of covered products. EPCA ensures that state and local regulations that (like the Municipal Appliance Bans) impact manufacturers and the installation of covered products and equipment are preempted.

AHRI respectfully urges the Court to rule that EPCA preempts the Municipal Appliance Bans and deny the motions to dismiss.

3

# ARGUMENT

**I.   In passing EPCA, Congress was concerned with eliminating the patchwork of state and local regulation "concerning" appliance energy efficiency and energy use.**

   **a. Federal preemption provisions must be read broadly to accurately express legislative intent.**

Congressional intent holds a special role in determining the scope of federal preemption. As the Supreme Court recognized, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotations omitted); *see also Air Conditioning & Refrig. Inst. v. Energy Res. Conserv. & Dev. Corp.*, 410 F.3d 492, 496 (9th Cir. 2005) (considering the "purpose of the statute as a whole, as revealed not only in the text, but through our reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law" (quoting *Medtronic*, 518 U.S. at 486 (cleaned up))).

   **b. EPCA preempts more than just state and local "energy conservation standards."**

Congress passed EPCA in 1975, in response to the proliferation of state-adopted appliance efficiency standards. Pub. L. No. 94-163, 89 Stat. 871 (1975); S. Rep. 100-6, at 3 (1987). Although the 1975 Act included a provision that preempted state standards, the U.S. Department of Energy ("DOE") soon adopted a "general policy" of granting states' requests for "waivers from preemption," neutering the 1975 Act's preemption provision. S. Rep. 100-6, at 3; *see also Air Conditioning & Refrig. Inst.*, 410 F.3d at 499-500 (recounting legislative history of EPCA and subsequent amendments).

4

Consequently, appliance manufacturers were "confronted with" a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances. *Air Conditioning & Refrig. Inst.*, 410 F.3d at 500 (quoting S. Rep. 100-6, at 4). In 1978, Congress amended EPCA to attempt to remedy that lack of uniformity, Pub. L. No. 95-619, 92 Stat. 3206, 3263-64 (1978), but it soon became clear that the problem persisted.

Then, Congress again amended EPCA by passing the 1987 National Appliance Energy Conservation Act, Pub. L. No. 100-12, 101 Stat. 103 (1987) ("NAECA"), which was the result of a "negotiated . . . compromise" between major manufacturer trade associations and an environmental advocacy group. *Air Conditioning & Refrig. Inst.*, 410 F.3d at 499. Under the compromise, manufacturers agreed to national energy use standards in exchange for a "strong preemption mechanism" to ensure manufacturers would never again be subjected to state and local regulations that complicate the "design, production, and marketing" of appliances. 133 Cong. Rec. H881-01, S. Rep. 100-6, at 4. The NAECA included a new, more stringent waiver provision, designed to make it more "difficult" to obtain a waiver and, consequently, restoring the effectiveness of EPCA preemption. S. Rep. 100-6, at 2-3.

The legislative history of EPCA and its amendments show that, after Congress's initial attempt to preempt state and local "energy efficiency standards" proved ineffective, Congress acted repeatedly to broaden the scope of preemption to sweep in *any* state and local regulation "concerning" "energy efficiency" or "energy use"—not just

5

numerical energy efficiency standards. The three versions of EPCA's preemption provisions are reproduced below:

> **1975**: "This part supersedes any State regulation insofar as such State regulation may now or hereafter *provide for ... any energy efficiency standard* or similar requirement with respect to energy efficiency or energy use of a covered product ...." Pub. L. No. 94-163, § 327, 89 Stat. 871, 926-27 (1975) (emphasis added).
>
> **1978:** "If a State regulation is prescribed which *establishes an energy efficiency standard or other requirement* respecting energy use or energy efficiency of a type (or class) of covered products, then a regulated party *may petition for preemption*. Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3263-64 (1978) (emphasis added).
>
> **1987:** "[N]o State regulation *concerning the energy efficiency or energy use* of such covered product shall be effective with respect to such product." Pub. L. No. 100-12, § 7, 101 Stat. 103, 118 (1987) (emphasis added).

In each successive version, Congress broadened the scope of the preemption provision. The 1975 version focused narrowly on preempting any state "energy efficiency standard," defined to mean "a performance standard . . . which prescribes a minimum level of energy efficiency for a covered product." Pub L. No. 94-163, § 321. The 1987 version, which remains substantially the version in effect today, is the broadest of the three versions. *See Cal. Rest. Ass'n*, 89 F.4th at 1104 n.6. The evolution of EPCA preemption from a narrow provision covering only a state-adopted "energy efficiency standard" to a broad prohibition on any state regulation "concerning . . . energy use," belies Denver's and Sierra Club's arguments that EPCA preemption covers only state energy efficiency standards. *See* ECF 57 at 8-9 (arguing that EPCA preempts state and local "energy conservation standards" and nothing more); ECF 58 at 4 (same).

6

This reading is further supported by another provision of EPCA, 42 U.S.C. § 6297(d)(1)(A)-(B), which allows DOE to waive preemption if the "State regulation is needed to meet unusual and compelling State or local energy . . . interests." But EPCA prohibits the Secretary from granting a waiver—thus ensuring that preemption applies—if the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." 42 U.S.C. § 6297(d)(3). In determining whether the requirements for waiver are met, the Secretary must consider the extent to which the State regulation will: "increase manufacturing or distribution costs," "disadvantage smaller manufacturers, distributors or dealers," "cause a burden to manufacturers to redesign and produce the covered product type," and "contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have." 42 U.S.C. § 6297(d)(3)(A)-(D).

### c. Denver's Municipal Appliance Bans would undo Congressional efforts to protect manufacturers from a regulatory "patchwork."

As even Denver and Sierra Club recognize, Congress enacted the strengthened preemption provision to protect manufacturers from the harmful effects of variegated state and local regulation of appliance energy use. ECF No. 57 at 8 (conceding that, in passing EPCA, Congress was concerned with maintaining "uniform" regulation); ECF No. 58 at 6 ("EPCA's preemption clause . . . . provides manufacturers clarity about the process of bringing a product to market by ensuring that they do not need to juggle 'a patchwork of conflicting and unpredictable State regulations.'") (citation omitted); *id*. at 9 (conceding that "Congress intended . . . to 'reduce the regulatory and economic burdens on the appliance manufacturing industry'") (quoting legislative history). Denver and

7

Sierra Club never explain how Denver's ban on certain EPCA-covered appliances that are permitted in the rest of the country conforms to Congress's intent to "to provide uniformity and predictability to manufacturers."  ECF No. 57 at 12.

Designing and manufacturing large commercial grade appliances requires a large capital investment and, consequently, substantial long-range capital planning by AHRI's members.  Similar investment and planning is necessary to market and distribute those appliances and to ensure that AHRI's members have the resources to service them during their decades of useful life.  This is why EPCA is forward-looking and contemplates significant years-long planning by manufacturers.  *See, e.g.,* 42 U.S.C. § 6295(b)(3)(C) (barring new DOE standards from going into effect for at least three years).[1]

In other words, although Congress permitted a waiver of preemption in certain circumstances, it took specific action to ensure that no state regulation, under any circumstance, could "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product."  42 U.S.C. § 6297(d)(3).  "Such a provision would make little sense if the scope of EPCA's preemption ends with the design or

---

[1] *See also* 42 U.S.C. §§ 6295(o)(2)(B)(i), 6295(o)(3)(B) (requiring DOE to conduct a multi-phase, comprehensive rulemaking to analyze the economic impact of the standards on manufacturers and consumers, the projected amount of energy savings "likely to result directly" from the standards, "any lessening of the utility" of products resulting from the standards, effect on competition, the need for energy conservation, and other factors); 10 C.F.R. Part 430, Subpart C, App. A, § 6(a)-(h).  Denver failed to conduct any meaningful economic and technical feasibility analysis on the effect of its programs on covered products as DOE is mandated to do under EPCA.

manufacture of the product"—as Denver and Sierra Club say it does. *Cal. Rest. Ass'n*, 89 F.4th at 1104.

Denver acknowledges that "a local law that requires consumers to purchase or use more efficient appliances than allowed under a federal standard would also be preempted as an indirect regulation." ECF No. 57 at 13 (citing *California Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc)). But that is precisely what the Municipal Appliance Bans do. Even Judge Friedland – who would have sustained the local regulation in *California Restaurant* as *not* preempted by EPCA – acknowledged that EPCA preempts building standards that "aim[] to require consumers to use products with higher efficiency standards than those prescribed by DOE." *California Rest. Ass'n*, 89 F.4th at 1125. In taking the building, rather than the equipment in the building, as the point of regulation, the Municipal Appliance Bans are not meaningfully distinct from a product-level regulation and, as such, remain subject to EPCA preemption. The Municipal Appliance Bans are preempted because they concern the energy use of covered products located in buildings subject to energy efficiency requirements.

### d. Analogous federal preemption provisions evidence Congress's legislative intent in enacting EPCA preemption.

Courts consistently interpret federal preemption statutes to respect Congress's intent to ensure regulatory uniformity. Consider the Clean Air Act's ("CAA") preemption of any state or local "standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). On its face, EPCA's preemption is broader than CAA's preemption: EPCA preempts any regulation

"concerning" energy efficiency or use, while the CAA preempts only "standard[s] relating to" motor vehicle engines or emissions.  Yet, courts interpret even the CAA's narrower preemptive language to ensure that Congressional intent of providing uniformity is not undermined by a state's clever legislative drafting.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1216 (9th Cir. 2020) (Section 7543(a) "precludes state or local governments from imposing any restriction that has the *purpose* of enforcing emission characteristics for pre-sale, motor vehicles." (emphasis added)).  Through § 7543(a), the CAA provides motor vehicle manufacturers with nationwide regulatory certainty and prevents "the possibility of a patchwork quilt of numerous and differing state-level regulatory programs for emissions from newly manufactured motor vehicles or newly manufactured motor vehicle engines."[2]  *See also Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 105 (2025) (noting that the purpose of § 7543(a) is "[t]o promote uniformity in vehicle emissions regulations") (internal quotations omitted).

Congress adopted the CAA preemption provision to ensure that "vehicle manufacturers not be subject to 50 different sets of requirements relating to emission controls which would unduly burden interstate commerce." H.R. Rep. 95-294, 309 (1977).  "From the manufacturing and marketing point of view . . . . [o]rdering, shipping, and transshipping of vehicles in the face of a variety of state laws creates additional costs and severe inconvenience to consumers."  *Id*. at 501.  The preemption provision

---

[2] *California and the Clean Air Act Waiver: Frequently Asked Questions*, Congressional Research Service, R48168 (May 9, 2025), available at: https://www.congress.gov/crs-product/R48168 (*last visited* Nov. 11, 2025).

10

provides the safeguard of a national standard "to eliminate undue economic strain on the industry." S. Rep. 90-403, 33 (1967).

The Supreme Court noted that a state's attempt to distinguish between sales restrictions and use restrictions is irrelevant: a ban on purchase or use is necessarily a ban on sales. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."). The Court cautioned that a "command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *Id*.; *see also Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (criticizing State efforts to "avoid preemption by shifting their regulatory focus" to different companies within the same supply chain because it did not "make[ ] any difference" that the State chose "an indirect but wholly effective means" of achieving a preempted goal); *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 158 (2d Cir. 2010) (rules "aim[ed] at the improvement of fuel economy" of taxi cab fleets were preempted by EPCA provision barring state regulations "related to fuel economy standards").

Here, EPCA authorizes the sale of covered products that meet federal standards and preempts State and local regulations that restrict that authorization. As the Supreme Court determined in *South Coast Air*, manufacturers' right to sell federally approved products is meaningless if, due to state or local regulation, consumers cannot

11

buy or use them. States and localities cannot "skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Cal. Rest. Ass'n*, 89 F.4th at 1107 (emphasis in original). Accordingly, EPCA preemption extends to regulations of the products themselves *and* regulations that concern their use.

## II. The Municipal Appliance Bans unlawfully "concern" "energy use" and "energy efficiency" of covered products.

EPCA defines "energy use" as the "quantity of [electricity, or fossil fuels] directly consumed" by covered consumer products or industrial equipment at the point of use. 42 U.S.C. § 6291(4) (consumer products), *id.* § 6311(4) (industrial use). As the plain text and legislative history of Denver's Energy Code demonstrates, the Municipal Appliance Bans indisputably "concern" "energy use" and "energy efficiency" of EPCA covered products.

Significantly, Denver concedes that the Municipal Appliance Bans "prevent the actual use of some regulated products." ECF No. 57 at 15; *see also* Denver Energy Code § C403.2.4 (prohibiting certain types of EPCA-covered space heaters); *id.* § C404.10 (prohibiting certain types of EPCA-covered water heaters). The Municipal Appliance Bans regulate the energy use of covered products by forcing building owners to use new covered appliances that meet Denver's preferred energy use and energy efficiency specifications, despite EPCA's broad federal preemption provision.

The history of Denver's revisions to the Energy Code confirms the intended effect on covered products. For instance, when the revisions to the Denver Energy Code were first adopted, council sponsors emphasized that 30% of the target energy use savings would be achieved by requiring new buildings to install new appliances meeting

higher efficiency standards.[3] Denver altered its program in 2022 and again in 2025 in part because neither the City "nor the community were prepared to make this massive pivot" toward "aggressive [] energy code proposals" in existing buildings.[4] But some of the most ambitious changes applicable to "space heating equipment and service water heating equipment . . . [and] regulations on fossil fuel and electric resistance equipment for these systems" still "apply to new buildings."[5]

Sierra Club argues that certain exceptions allowing building owners to rely on "total building performance" exempt the Denver Energy Code from EPCA preemption. ECF No. 58 at 12; *see also* DENVER ENERGY CODE § C403.2.4.3 (excepting buildings in compliance with Section C407 from prohibitions on certain covered appliances); *id.* § C407.3 (setting "Building Performance Factor" for types of buildings). But a building's "energy use" is made up of the "energy use" of the appliances within that building,

---

[3] Council Bill 21-1310: Hearing before the Safety, Housing, Education & Homelessness Committee (Testimony of Christine Brinker, Southwest Energy Efficiency Project, at Minute 34:19-48) (Denver City Council) (Nov. 3, 2021) available at https://denver.granicus.com/player/clip/14536?view_id=180&meta_id=984901&redirect=true (*last visited* Nov. 11. 2025).

[4] Council Bill 25-0735: Hearing before the Land Use, Transportation and Infrastructure Committee (Testimony of Eric Browning, Chief Building Official with Community Planning and Development, at Minute 4:50-59) (Denver City Council) (May 20, 2025) available at https://denver.granicus.com/player/clip/16909?view_id=180&meta_id=1558035&redirect=true (last visited January 27, 2026); Council Bill 22-1653: Hearing before the Land Use, Transportation and Infrastructure Committee (Testimony of Eric Browning, Chief Building Official with Community Planning and Development, at Minute 30:49) (Denver City Council) (Dec. 20, 2022) available at https://denver.granicus.com/player/clip/15200?view_id=180&meta_id=1179042&redirect=true (last visited January 27, 2026).

[5] Council Bill 25-0735: Hearing before the Land Use, Transportation and Infrastructure Committee (Testimony of Dave Wren, Community Planning and Development, at Minute 18:21-32) (Denver City Council) (May 20, 2025).

13

nearly all of which are "covered appliances" under EPCA. The building itself uses only that energy used by the appliances and other equipment within it. *See, e.g., Mulhern Gas Co., Inc. v. Mosley*, No. 1:23-CV-1267, 2025 WL 2062194, at *14 (N.D.N.Y. July 23, 2025) (noting that a regulation that "explicitly sets a maximum building-wide energy consumption limit" "would be clearly preempted" under EPCA because it "would be an indirect regulation concerning the energy use of covered products that could be used in that building.").

The Municipal Appliance Bans, if sustained, would undo the national regulatory uniformity established in EPCA, at great cost to manufacturers like AHRI's members. *See S. Coast Air Quality Mgt. Dist.,* 541 U.S. at 255 ("[I]f one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme."). Congress sought to avoid a patchwork of state and local energy efficiency requirements in enacting EPCA and by limiting the ability of states to enact requirements that indirectly burden manufacturers. AHRI supports Denver's goals of reducing greenhouse gas emissions. But those goals must be achieved in compliance with—not in violation of—federal law.

## CONCLUSION

The court should deny the motions to dismiss.

Respectfully submitted this 9th day of February, 2026.

               WILLIAMS WEESE PEPPLE & FERGUSON PC

               */s/ Carlos R. Romo*
               Carlos R. Romo
               John H. Bernetich
               1801 California Street, Suite 3400
               Denver, CO 80202
               Phone Number: 303-861-2828
               Fax Number: 303-861-4017
               E-mail: cromo@williamsweese.com
               jbernetich@williamsweese.com

               *Attorneys for Air-Conditioning, Heating & Refrigeration Institute*

# CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2025, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification to the following:

Ronald Scott Novak, Jr.
Baker Botts LLP
700 K Street NW
Washington, DC 20001
scott.novak@bakerbotts.com

Jonathan Mark Little
Baker Botts LLP
910 Louisiana St.
Houston, TX 77002
mark.little@bakerbotts.com

*Attorneys for Plaintiffs*

Michele Annette Horn
Adam C. Hernandez
Denver City Attorney's Office
201 West Colfax Avenue
Denver, CO 80202-5332
michele.horn@denvergov.org
adam.hernandez2@denvergov.org

*Attorneys for Defendant City
and County of Denver*

Michael A. Hiatt
Emma Hardy
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
mhiatt@earthjustice.org
ehardy@earthjustice.org

Matthew Gerhart
Jim Dennison
Sierra Club
1536 Wynkoop St., Suite 200
Denver, CO 80202
matt.gerhart@sierraclub.org
jim.dennison@sierraclub.org

*Attorneys for Defendant-Intervenor
Sierra Club*

/s/ Brenda Trujillo
WILLIAMS WEESE PEPPLE & FERGUSON PC