**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER, NATIONAL ASSOCIATION OF HOME BUILDERS OF
THE UNITED STATES, COLORADO RESTAURANT ASSOCIATION, HOME BUILDERS
ASSOCIATION OF METROPOLITAN DENVER, AMERICAN HOTEL & LODGING
ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, and NATIONAL PROPANE
GAS ASSOCIATION,

     Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

     Defendant,

SIERRA CLUB,

     Defendant-Intervenor.

---

**DEFENDANT-INTERVENOR SIERRA CLUB'S REPLY IN SUPPORT OF
MOTION TO DISMISS**

---

The Industry Groups' Response to Sierra Club's Motion to Dismiss relies heavily on

*California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). This

reliance is misplaced for two reasons. First, even if the Ninth Circuit correctly interpreted the

Energy Policy and Conservation Act (EPCA) in *Berkeley*, that case has no application to

Denver's Standards, which are materially different than the regulations in *Berkeley*. The Industry

Groups attempt to shoehorn this case into the fact pattern at issue in *Berkeley* by lumping all of

Denver's Standards together and mischaracterizing the Standards as a "ban" on the use of gas

appliances. But at the motion to dismiss stage, the Court should not accept the Industry Groups'

legal allegations as true, including their unsupported characterization of the content and effect of

Denver's Standards. The Industry Groups challenge five separate Standards in their Complaint,

1

and each Standard applies to a unique subset of equipment, imposes a unique set of requirements, and includes unique exceptions to ensure compliance is feasible. But one fact common to all the Standards is that none of them draws any distinction based on how much energy the covered equipment is designed to use. Instead, the Standards regulate other, unrelated qualities of the equipment, such as its size or fuel type, to reduce health hazards and greenhouse gas emissions. This is consistent with EPCA.

Second, *Berkeley* was wrongly decided. The *Berkeley* panel opinion is no more binding on this Court than its dissent, which pointedly warned other courts "not to repeat the panel opinion's mistakes." 89 F.4th at 1119. Moreover, the Industry Groups' Response ignores that every other district court to address EPCA preemption issues since *Berkeley* has declined to follow that panel opinion. *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d. 304, 325–26 (N.D.N.Y. 2025); *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025) (*ACP*). This Court should join these other courts and not follow *Berkeley's* unprecedented expansion of EPCA preemption.

## ARGUMENT

### I.     The Industry Groups fail to respond to Sierra Club's arguments that EPCA does not preempt the existing buildings standards.

The Amended Complaint alleges that Denver's Standards for both new and existing buildings are preempted. Am. Compl. ¶¶ 67, 81, 84, 87, 93, 94 (Docket No. 52). Sierra Club thus interprets the Amended Complaint to challenge Denver's Standards for existing buildings at Sections C503.3.2, C503.3.3, and C503.4.1. Sierra Club Mot. to Dismiss 1st Am. Compl. at 13 (Docket No. 58) [hereinafter MTD]. Sierra Club's Motion to Dismiss explained that even under the Industry Groups' interpretation, EPCA does not preempt these standards for existing buildings because they expressly allow the continued use of gas appliances. *Id.* at 13–15.

2

The Industry Groups' Response does not discuss the existing building standards, and thus they have effectively abandoned any challenge to Sections C503.3.2, C503.3.3, and C503.4.1. *See Brown v. Nationwide Ins. Co.*, No. 21-4122, 2023 WL 4174064, at \*9 (10th Cir. June 26, 2023) (party abandoned a claim it did not address in response to a motion to dismiss). At a minimum, the Court must therefore dismiss the Industry Groups' challenges to Sections C503.3.2, C503.3.3, and C503.4.1.

II. **The Industry Groups do not offer any compelling reasons why the Court should apply *Berkeley* to this case.**

A. **EPCA defines "energy use" and "energy efficiency" as representative measures of the energy a product consumes based on its typical operating conditions.**

This case largely turns on the meaning of "energy use" and "energy efficiency," as EPCA preempts regulations "concerning the energy efficiency [or] energy use" of covered products subject to federal energy conservation standards. 42 U.S.C. § 6297(c). These terms are fixed design characteristics that apply equally to all products of the same model, regardless of the actual amount of energy an individual appliance consumes when operating. MTD at 5. This is clear from the definitions' references to "test procedures," which require the Department of Energy (DOE) to determine energy use and efficiency "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). EPCA's preemption provision thus prohibits states from setting design standards that differ from a federal standard. *Id.* § 6297(c).

*Berkeley* improperly reads "energy use" and "energy efficiency" as referring to the actual day-to-day use of individual products. *Berkeley* contravenes traditional rules of statutory interpretation, as it relies on a colloquial interpretation of a technical term, "point of use," and the Industry Groups double down on this incorrect reading. *Berkeley*, 89 F.4th at 1101–03; Pls.' Resp. to Sierra Club Mot. to Dismiss at 6–7 (Docket No. 60) [hereinafter Resp.]. In doing so, the

3

Industry Groups ignore the well-recognized exception to the ordinary-meaning canon for statutes that address technical subjects, which Sierra Club, the *Berkeley* dissent, and *Association of Contracting Plumbers* all recognized and applied. *See, e.g.*, *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) ("When a statute is addressing a technical subject, a specialized meaning is to be expected." (cleaned up)); *United States v. Thomas*, 939 F.3d 1121, 1125 (10th Cir. 2019); *Berkeley*, 89 F.4th at 1125 (Friedland, J., dissenting); *ACP*, 2025 WL 843619, at *4–5.

### B. EPCA's provisions that address household energy do not alter the statute-wide meaning of "energy use."

Defining "energy use" and "energy efficiency" as design characteristics and interpreting the scope of preemption accordingly is the only reading of EPCA consistent with its statutory framework. It is consistent with sections 6293 to 6296, which govern manufacturers' conduct from the design to the distribution of covered products. MTD at 5–6. And it is the only interpretation that makes several statutory provisions possible to implement. *Id.* at 7–8.

In response, the Industry Groups point to two other EPCA provisions, sections 6292(b)(1)(B) and 6295(*l*)(1)(B). They claim these sections "expressly contemplate that the term 'energy use' includes real-world use of the appliances." Resp. at 5. That is not true. Section 6292(b)(1)(B) refers to the "average annual per-household energy use" of a product type, which is a separately defined term that requires estimations, not measurements of real-world use. 42 U.S.C. § 6292(2)(A). Indeed, DOE determines this value by multiplying lab-tested efficiency values by typical levels of annual use. 78 Fed. Reg. 65223, 65225–28 (Oct. 31, 2013).

Section 6295(*l*)(1)(B) authorizes DOE to prescribe new energy conservation standards for covered products and refers to "aggregate household energy use." This section similarly relies on test procedures to estimate aggregate energy use. DOE generally may not prescribe new standards unless it has already prescribed test procedures for the affected products, 42 U.S.C. §

6295(o)(3)(A), and DOE uses these test procedures to estimate aggregate household energy use. *See, e.g.,* 88 Fed. Reg. 21512, 21513 (Apr. 11, 2023) (estimating aggregate household energy use for air cleaners using "the DOE test procedure for air cleaners").

The Court should reject the Industry Groups' contradictory theory that "'energy use' has multiple different usages" across EPCA. Resp. at 7. Industry Groups do not identify any context in Section 6297(c) that would require a different meaning of "energy use" than the statutory definition that is applied consistently throughout EPCA. If anything, the explicit references to average or aggregate energy use in Industry Groups' cited provisions suggest a contextual use that would depart from the rest of the statute.

The Industry Groups also mistakenly claim that the building code exception to EPCA preemption supports their interpretation. Resp. at 6 (citing 42 U.S.C. § 6297(f)). *Mulhern* explained how this exception is compatible with the correct interpretation of "energy use" as a fixed design feature. 798 F. Supp. 3d. at 326–27.

### C. EPCA's legislative history demonstrates that Congress intended EPCA to address a focused problem with a limited range of tools.

The Industry Groups claim EPCA's legislative history supports their preemption argument. Resp. at 8–10. However, Congress never intended EPCA to give the federal government exclusive control over all forms of appliance regulations. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) (*ACRI*) ("[T]he legislative history of [EPCA] supports a narrow interpretation of the preemption provision."). From the beginning, Congress intended EPCA to serve a tailored purpose: reducing domestic energy consumption. *See* S. Rep. No. 94-516, 94th Cong., 1st Sess. 116–17 (1975). Congress intended that the means for achieving that purpose to be tailored as well. It enacted EPCA to "induce manufacturers to produce ([and] consumers to purchase)

products of that class which achieve the maximum energy efficiency that is technologically feasible and economically justified." *Id.* at 119. To that end, it "require[d] test procedures for, and energy efficiency labeling of, major home appliances." *Id.*[1]

EPCA does not regulate aspects of appliances unrelated to energy efficiency. When Congress strengthened EPCA's energy conservation standards and preemption provisions in the wake of "a growing patchwork of differing state regulations" after its enactment, it did not change EPCA's scope. *Amicus Curiae* Air Conditioning, Heating, & Refrigeration Inst. Br. in Supp. of Pls.' Resp. at 5 (Docket No. 61-1) [hereinafter AHRI Br.] (quoting *ACRI*, 410 F.3d at 500). It merely sought to ensure manufacturers faced a uniform set of standards given EPCA's original goal to "design, produc[e], and market[]" efficient appliances, Resp. at 8 (quoting S. Rept. 100-6, at 4 (1987)); AHRI Br. at 5. There is no evidence Congress intended to regulate aspects of appliances unrelated to how much energy those appliances are designed to use. Congress therefore did not intend for EPCA to preempt regulations such as Denver's Standards, which regulate appliances' size and fuel type, not their energy use.

### D.  Congress did not intend EPCA to upset the balance of federalism.

Under the Industry Groups' interpretation of EPCA preemption, state and local governments would be powerless to enact public health and safety regulations for any appliances that are subject to a federal energy conservation standard. MTD at 9–10. The Industry Groups mischaracterize Sierra Club's argument as creating a "police-power or public-health exception to

---

[1] The Industry Groups claim the differing federal and local objectives are irrelevant, but they conflate express preemption with their cited implied preemption cases. *See* Resp. at 9. Here, Congress' purpose in enacting EPCA "is the ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal citations and quotations omitted)). That purpose does not include regulating air pollution, climate change, or the environment, or impeding state regulation in these areas. Congress thus did not intend for EPCA to preempt Denver's Standards that address climate change and air quality through mechanisms unrelated to covered products' energy use.

federal preemption." Resp. at 11. Not so. Congress is free to legislate in areas traditionally regulated by states, including by preempting such regulations. But because "[t]his is an extraordinary power in a federalist system" that courts "must assume Congress does not exercise lightly," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (quoting *USFS v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020)). ECPA does not provide this "exceedingly clear" language.

The Industry Groups', and *Berkeley*'s, interpretation of EPCA's preemption provision violates this clear statement rule. For example, under the Industry Groups' interpretation, EPCA threatens to preempt Denver's and Colorado's bans on unvented room heaters because they interfere with consumers' unfettered use of an EPCA-covered appliance. It does not stop there. Under *Berkeley*, each new conservation standard that DOE sets would invalidate a host of state and local regulations that address entirely different concerns, from air pollution to fire safety.

The Industry Groups fail to identify any limiting principle in their expansive EPCA interpretation that would avoid preempting "longstanding health-and-safety regulations that have traditionally coexisted with EPCA." Resp. at 12. Courts routinely reject statutory interpretations that lack a limiting principle that would prevent results that Congress could not have intended. *See, e.g.*, *EPA v. Calamut Shreveport Refin., LLC.*, 145 S. Ct. 1735, 1748 (2025); *United States v. Chavarria*, 140 F.4th 1257, 1260 (10th Cir. 2025). Here, the Industry Groups interpret EPCA to preempt any regulation that has the practical effect of limiting a consumer's use of an EPCA-covered appliance, as every such regulation would purportedly be a "backdoor energy conservation standard that bans EPCA-covered . . . appliances." Resp. at 11.

The Industry Groups' sweeping interpretation would preempt a whole host of health and safety regulations that virtually every city and state in the country has adopted, from residential zoning codes that effectively ban covered industrial equipment, to noise ordinances that prohibit the use of covered equipment that is too loud, to prohibitions on the use of equipment that is not installed by licensed professionals and maintained in a way that minimizes fire risk. The Industry Groups offer this Court no principled basis for concluding that EPCA would preempt Denver's Standards but not these other widespread health and safety laws that regulate or prohibit certain appliances, but do not concern their energy use.

## III.     EPCA does not preempt Denver's new building standards.

Denver's new building standards, Sections C403.2.4 and C404.10, regulate what types of space and water heaters can be installed in new buildings based on a separate, independent attribute: the product's fuel type.[2] EPCA does not preempt these standards. *See Mulhern*, 798 F. Supp. 3d at 326 (EPCA does not preempt laws that "merely prohibit the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems."); *ACP*, 2025 WL 843619, at *6.

The Industry Groups claim that even if energy use is a design characteristic measured on the factory floor, Denver's Standards require that value to be zero for gas heaters by prohibiting their use in certain circumstances. Resp. at 12–14. This misrepresents what the Standards do.

The premise of the Industry Groups' argument is incorrect, as Denver's new building Standards do not categorically ban gas heating equipment. Instead, sections C403.2.4 and C404.10 contain far-reaching exceptions that in practice swallow the rule. MTD at 12–13. But

---

[2] AHRI's amicus brief relies on facts outside the record on this point. *See* AHRI Br. at 13 n.3. The Court should not consider these facts, as the parties agreed not to convert these Motions to Dismiss into Motions for Summary Judgment. Resp. at 15 n.9.

even accepting the Industry Groups' premise for the sake of argument, their argument does not withstand scrutiny. Contrary to their contention, a product's energy *use* is independent from its fuel type. EPCA preempts only the former, and Denver's Standards concern only the latter. Denver's Standards apply uniformly to equipment whose fuel type is gas no matter what the equipment's energy *use* is—whether it be zero or any other number.

For example, in a circumstance where none of the multiple and far-reaching exceptions apply, Denver's Standards would restrict the installation of a gas appliance even if it were to use zero energy. A gas furnace that uses zero energy is still a "fossil-fuel warm air furnace" subject to Section C403.2.4. This illustrates the difference between Denver's regulation based on fuel type and a regulation based on energy use. The Standards "do[] not draw any distinction between products based on their energy efficiency or energy use as manufactured." *ACP*, 2025 WL 843619, at *6. Manufacturers could not change the application of Denver's standards by reducing their products' energy use (even to zero), so they have "no reason to change the design of their natural gas products to meet standards higher than those prescribed by DOE." *Berkeley*, 89 F.4th at 1126 (Friedland, J., dissenting). Rather, Denver's standards address an entirely separate attribute of the equipment.

The Industry Groups also argue that if the Court upholds the Standards, nothing would prevent Denver from issuing regulations that favor classes of appliances with higher federal energy efficiency standards. Resp. at 14. But EPCA does not distinguish between more efficient and less efficient product classes; it defines "class[es] of covered products" as groups of products whose "functions or intended uses … are similar." 42 U.S.C. § 6291(9). Thus, to the extent a local government regulates which classes of covered products are installed in a building without drawing distinctions between them based on energy use, the regulation concerns the functions

9

and uses of the building's equipment (such as fuel type), not covered products' energy efficiency. And because different product classes use different measures of energy efficiency, it makes no sense to state that one class has higher energy efficiency standards than another. Thus, contrary to the Industry Groups' assertion, Sierra Club agrees with Denver that it cannot "indirectly regulate the energy consumption of a regulated product by preventing the use of a product *because of its energy consumption* that is otherwise compliant with a federal standard established under EPCA." Resp. at 15 (quoting Denver MTD at 14–15 (Docket No. 57)) (emphasis added). The Court should uphold Denver's Standards because EPCA only preempts regulations concerning the energy efficiency or energy use of appliances, as measured by specific test procedures—which Denver's Standards do not do.

## CONCLUSION

The Court should grant Sierra Club's Motion to Dismiss and dismiss the First Amendment Complaint in its entirety under Rule 12(b)(6).

Dated February 23, 2026.

| | |
|---|---|
| /s/ Michael A. Hiatt | Matthew Gerhart |
| Michael A. Hiatt | Jim Dennison |
| Emma Hardy | Sierra Club |
| Earthjustice | 1536 Wynkoop St., Suite 200 |
| 1125 17th Street, Suite 1010 | Denver, CO 80202 |
| Denver, CO 80202 | (303) 454-3346 |
| (303) 623-9466 | matt.gerhart@sierraclub.org |
| mhiatt@earthjustice.org | jim.dennison@sierraclub.org |
| ehardy@earthjustice.org | |

*Attorneys for Defendant-Intervenor Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I caused a true and correct copy of the foregoing **DEFENDANT-INTERVENOR SIERRA CLUB'S REPLY IN SUPPORT OF MOTION TO DISMISS** to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

Ronald Scott Novak, Jr.
Baker Botts LLP
700 K Street NW
Washington, DC 20001
(202) 639-7786
scott.novak@bakerbotts.com

*Attorney for Plaintiffs*

Jonathan Mark Little
Baker Botts LLP
910 Louisiana St.
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

*Attorney for Plaintiffs*

Michele Annette Horn
Adam C. Hernandez
Denver City Attorney's Office
201 West Colfax Avenue
Denver, CO  80202-5332
(720) 913-3260
michele.horn@denvergov.org

*Attorneys for Defendant City
and County of Denver*

/s/ *Michael A. Hiatt*
Michael A. Hiatt
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
mhiatt@earthjustice.org